UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

|  |  |
|---|---|
| ANTHONY D. WARD,<br><br>          Plaintiff,<br><br>     vs.<br><br>UNITED STATES MARSHALS; SHERIFF KEVIN THOMM[1]; SHERIFF BRIAN MUELLER; COMMANDER ROBERT YANTIS; CAPTAIN CASEY MUNSCH; LT. KATHLEEN HOUSTON; LT. WILSON; SGT. REICHERT; CO. SCOTT MOORE; CO. ESPINOZA; CO. CARMEN[2]; ADMIN. CO. DONELL WELCH; ADMIN. CO. MADISON HOUSTON; DR. JOHN/JANE DOE; DR. RACHEL (last name unknown); NURSE MEGAN (last name unknown); RAPID CITY, City in State of South Dakota; COUNTY PENNINGTON, a County in South Dakota; TRINITY SERVICES GROUP, INC.; and NURSE JANE DOE,<br><br>          Defendants. | 5:23-CV-05061-CCT<br><br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS, DENYING PLAINTIFF'S OTHER VARIOUS MOTIONS, AND 1915A SCREENING** |

---

[1] Throughout Ward's complaint he spells the defendant's name as Thom and Thomm. *See generally* Docket 1. Because Ward more commonly refers to the defendant as Thom, this Court adopts that spelling.

[2] Throughout his complaint, Ward refers to defendant Camren. *See generally* Docket 1. For the purposes of screening, this Court assumes that Ward is referencing defendant Carmen. Because Ward more frequently spells the defendant's name as Camren, this Court adopts that spelling.

Plaintiff, Anthony D. Ward, an inmate at the Federal Correctional Institution (FCI) Mendota, in Mendota, California,[3] filed a pro se lawsuit under various federal laws.[4] Docket 1. Ward moves for leave to proceed in forma pauperis and provided his prisoner trust account report. Dockets 3, 3-1, 4. Ward filed a motion for a preliminary injunction and temporary restraining order. Docket 2. He also filed a motion to appoint counsel. Docket 5. He also filed a supplement to his complaint. Docket 8.

**MOTIONS FOR LEAVE TO PROCEED IN FORMA PAUPERIS**

Under the Prison Litigation Reform Act (PLRA), a prisoner who "brings a civil action or files an appeal in forma pauperis . . . shall be required to pay the full amount of a filing fee." 28 U.S.C. § 1915(b)(1). The Court may, however, accept partial payment of the initial filing fee where appropriate. Therefore, "[w]hen an inmate seeks pauper status, the only issue is whether the inmate pays the entire fee at the initiation of the proceedings or over a period of time

---

[3] At the time Ward filed his complaint, he was a pretrial detainee at the Pennington County Jail. Docket 1. Ward's claims arise from conduct occurring when he was housed at the Pennington County Jail. *Id.* Ward has since been sentenced and transferred to FCI Mendota. Docket 15; *see also* Docket 10 (transfer from Pennington County Jail to Winner County Jail); Docket 11 (transfer from Winner County Jail back to Pennington County Jail); Docket 13 (transfer from Pennington County Jail to Washington County Justice Center, in Akron, Colorado).

[4] On October 18, 2023, Ward filed a supplement to his complaint, which indicated that his claims against employees of Pennington County Jail arise under 28 U.S.C. § 1331. Docket 8 at 1–2. "An action under *Bivens* [28 U.S.C. § 1331] is almost identical to an action under [42 U.S.C. §] 1983, except that the former is maintained against federal officials while the latter is against state officials." *Christian v. Crawford*, 907 F.2d 808, 810 (8th Cir. 1990). Thus, this Court will construe Ward's claims against Pennington County Jail staff as arising under § 1983 and claims against federal defendants as arising under § 1331.

under an installment plan." *Henderson v. Norris*, 129 F.3d 481, 483 (8th Cir. 1997) (quoting *McGore v. Wrigglesworth*, 114 F.3d 601, 604 (6th Cir. 1997)).

The initial partial filing fee that accompanies an installment plan is calculated according to 28 U.S.C. § 1915(b)(1), which requires a payment of 20 percent of the greater of:

    (A)    the average monthly deposits to the prisoner's account; or
    (B)    the average monthly balance in the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.

Ward filed a motion to proceed in forma pauperis. Docket 3. His prisoner trust account report shows his average monthly deposits to be $0.00 and his average monthly balance as $0.00. Docket 4 at 1. Thus, this Court grants Ward's first motion for leave to proceed in forma pauperis, Docket 3, and waives his initial partial filing fee. *See* 28 U.S.C. § 1915(b)(4) ("In no event shall a prisoner be prohibited from bringing a civil action . . . for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee."). Because the Court granted Ward's first motion for leave to proceed in forma pauperis, Ward's second motion for leave to proceed in forma pauperis, Docket 3-1, is denied as moot.

In order to pay his filing fee, Ward must "make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account." 28 U.S.C. § 1915(b)(2). The statute places the burden on the prisoner's institution to collect the additional monthly payments and forward them to the court as follows:

> After payment of the initial partial filing fee, the prisoner shall be required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. The agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court each time the amount in the account exceeds $10 until the filing fees are paid.

28 U.S.C. § 1915(b)(2). The installments will be collected pursuant to this procedure.

The Clerk of Court will send a copy of this order to the appropriate financial official at plaintiff's institution. Ward will remain responsible for the entire filing fee, as long as he is a prisoner, even if the case is dismissed at some later time. *See In re Tyler*, 110 F.3d 528, 529–30 (8th Cir. 1997).

## 1915A SCREENING

### I.    Factual Background

In March 2022, Ward was assigned as a pretrial detainee to the Pennington County Jail (PCJ). Docket 1 at 12, 28, 40, 57, 72, 86. Ward alleges that the during his detainment at PCJ, defendants violated his rights under the Federal Tort Claims Act (28 U.S.C. §§ 1346, 1402), Religious Land Use and Institutionalized Person Act (42 U.S.C. §§ 2000cc through 2000cc-5), Religious Freedom Restoration Act (42 U.S.C. §§ 2000bb through 2000bb-4), as well as the First, Fourth, Fifth, Sixth, and Fourteenth Amendments. *Id.* at 8. Ward also cites to the Administrative Procedures Act (5 U.S.C. § 702) as a ground for relief. *Id.* at 1, 2, 8. Ward sues former Pennington County Sheriff Kevin Thom, Pennington County Sheriff Brian Mueller,[5] PCJ Commander Robert Yantis, PCJ

---

[5] Ward claims that Thom was sheriff at the time Ward was incarcerated until January 2023, at which time Mueller became the sheriff. Docket 1 at 3.

Captain Casey Munsch, PCJ Lieutenant Kathleen Houston, PCJ Lieutenant
Wilson, PCJ Sergeant Reichert, PCJ Senior Correctional Officer Scott Moore,
PCJ Senior Correctional Officer Espinoza, PCJ Black Shirt Correctional Officer
Camren, PCJ Mail Room Administrator Correctional Officer Donell Welch, PCJ
Mail Room Administrator Correctional Officer Madison Houston, PCJ Physician
Dr. Jane/John Doe, PCJ Physician Dr. Rachel, PCJ Nurse Megan, PCJ Nurse
Jane Doe, City of Rapid City, County of Pennington (Pennington County),
United States Marshals (USM), and Trinity Services Group (TSG).[6] *Id.* at 3–6, 8.

### A.    Religious Exercise and Nutrition

On March 26, 2022, Ward filed a request to be placed on the PCJ kosher
diet program. *Id.* at 12. On March 31, 2022, Ward talked with a staff member
about receiving a kosher diet and was assigned to the kosher diet program the
next day. *Id.* He filed a grievance about his first kosher meal because the food
items had been opened, which made them non-kosher. *Id.* On April 8, 2022, he
filed a grievance via the mail about the kosher meals and lack of services for
Jewish, Muslim, and Israelite inmates and pretrial detainees. *Id.*; Docket 1-1 at
5–11. On April 9, 2022, Ward wrote a handwritten message to the jail about
Passover and religious meals, but he refiled the grievance on a kiosk the next
day, at Kathleen's request. Docket 1 at 12. Kathleen denied Ward's request
because Passover was only five days away; Ward replied, confused as to why

---

[6] TSG is a private company that contracts with the PCJ to provide food services.
Docket 1 at 8. A private company providing services to a governmental entity and
acting under color of law can be sued under § 1983. *See West v. Atkins*, 487 U.S. 42,
56 n.14 (1988). Thus, for the purposes of screening, this Court assumes TSG was
acting under color of law.

the PCJ did not have a religious leader, such as a rabbi or chaplain, to provide meal services. *Id.* at 13.

On April 13, 2022, Ward filed a grievance about his meals not being kosher, him not being able to observe Passover, and him not being able to assemble with people of his religion, despite the PCJ permitting Christian inmates to do so; Kathleen denied Ward's grievance. *Id.*; *see also* Docket 1-1 at 23. Ward received an email informing him that items he ordered in commissary that were not kosher were removed from his request. Docket 1 at 13, 72; *see also* Docket 1-1 at 24, 164. But Ward claims that the items were not marked as non-kosher. Docket 1 at 13.

On July 28, 2022, Ward asked the kitchen staff why there was not a sweet item on the kosher tray like there was on all other meal trays. *Id.*; Docket 1-1 at 24. On July 29, 2022, Munsch said that the jail had a nutritionist and Ward could purchase items from commissary if he wanted. Docket 1 at 13. Ward's response complained about the nutritionist and how the meals provided do not meet kosher requirements because the food is handled by many people who do not follow Ward's belief. *Id.* at 13–15; Docket 1-1 at 25. Ward also later responded and indicated that kosher meals amount to only 2,000 to 2,500 calories per day; he claims that 300 calories per meal comes from butter, which allegedly deprives him of 900 calories per day of nutritional value. Docket 1 at 14; Docket 1-1 at 26, 36–38. Munsch responded and informed Ward that the nutritionist ensures proper calorie counts. Docket 1 at 14–15; Docket 1-1 at

26. Munsch informed Ward that he should speak with medical if he needs a medical diet with less butter for heart issues. Docket 1 at 15; Docket 1-1 at 29.

Ward received another email from the PCJ stating that he will be taken off the kosher meal list for ordering items from commissary that are not kosher, but he claims that the only items he ordered that may not have been kosher were stamps and erasers. Docket 1 at 13–14, 73; Docket 1-1 at 25, 27–28, 175. On July 30, 2022, Ward filed a grievance about retaliation, including the threat of him no longer receiving kosher meals. Docket 1 at 14; Docket 1-1 at 27, 164. On August 1, 2022, Kathleen responded to the grievance and stated that if he continued to order non-kosher items, then he will no longer receive kosher meals. Docket 1 at 14; Docket 1-1 at 28.

On August 23, 2022, Ward complained that he received tortillas with ash or mold on them, and he informed the correctional officers that this food was not kosher. Docket 1 at 16–17. Staff refused to replace the tortillas, but Kathleen stated that the tortilla was replaced. *Id.*

On August 26, 2022, Ward filed a request to receive religious meals for Rosh Hashanah, Yom Kippur, and Sukkoth. *Id.* at 17. His request was denied, and he filed a grievance about the denial. *Id.* at 17, 73. Kathleen denied the grievance because "the jail doesn't have to pay for religious meals." *Id.* at 17; *see also* Docket 1-1 at 16. Ward appealed Kathleen's denial. Docket 1 at 17. When Ward continued to request religious meals for holidays, Kathleen told Ward that if he "wanted the [religious holiday] meals he must purchase them in order to observe the holiday." *Id.* at 18.

In September 2022, TSG became the food vendor for the PCJ. *Id.* at 8, 18. On September 19, 2022, Ward filed a complaint about the calorie count and nutrition for kosher meals because he was not receiving sufficient calories nor the required breakdown of one vegetable, one fruit, one grain, one carbohydrate, and one protein. *Id.* at 17. Kathleen denied Ward's complaint because meals are approved by the dietician. *Id.* at 18. Ward requested the name of the dietician in order to hold him or her accountable, but Kathleen denied his request. *Id.* Ward appealed, and Yantis responded asking Ward "why are you mad?" *Id.* at 73.

Ward filed another grievance about meals not being kosher on November 20, 2022. *Id.* at 18. He was served sweet and sour biscuits and gravy, which he alleges included non-kosher gelatin. *Id.* Kathleen denied his grievance and informed him that there was not gelatin in the food. *Id.* at 19. Munsch also ignored Ward's concerns. *Id.* Yantis informed Ward that the gelatin was kosher because there is no pork in the jail, but pork was served with breakfast the very next day. *Id.*; *see also* Docket 1-1 at 128.

Ward requested to receive a holiday meal for Hanukkah, which was approved and later denied in retaliation. Docket 1 at 19, 73; Docket 1-1 at 165. Ward filed a grievance about the denial of a religious meal, but Kathleen again informed him that "the jail doesn't have to pay for holiday meals." Docket 1 at 19; *see also* Docket 1-1 at 55–57. Ward filed another grievance, which Munsch denied. Docket 1 at 19–20. Ward appealed the grievance, claiming discrimination because Christian inmates were provided holiday meals. *Id.* at

8

20. Yantis responded and informed Ward that special meals are provided for American holidays, not Christian holidays. *Id.* Yantis stated that requests for religious meals should be filed more than thirty days before the holiday and he will decide if a religious meal will be provided. *Id.* Ultimately, Ward's brother purchased him food for the religious holiday, but the jail denied it. *Id.* at 73; Docket 1-1 at 165. Ward also raised a concern about how Passover meals contain packages with leaven bread, despite Passover being the festival of unleavened bread. Docket 1 at 20. Munsch told Ward to file a request, which was approved. *Id.*

On April 6, 2023, the first day of Passover, Ward was permitted to eat his meal at sunset in accordance with his religious fasting time. *Id.* However, on the second day of Passover, Ward was forced to eat his meal at other times in retaliation for him filing grievances on other issues. *Id.* at 20–21, 74; *see also* Docket 1-1 at 62–64, 70–72, 74–75, 166. Ward filed grievances about his meals, but Kathleen and Munsch denied or ignored his grievances. Docket 1 at 21. Ward claims that he was targeted again at the demand of command staff on the last meal of Passover. *Id.*

On April 23, 2023, Espinoza confronted Ward about saving food to eat outside of meal hours. *Id.* Espinoza threw away the food that Ward saved. *Id.* at 21, 74; Docket 1-1 at 88, 126, 166. Ward complained that he needed to be provided food equivalent to 500 calories to compensate for the value of calories that was thrown away, but Ward was not provided additional food and was

instead placed on lockdown.[7] Docket 1 at 21; Docket 1-1 at 90–93, 186. On the same day, Espinoza later prevented Ward from receiving lunch. Docket 1 at 21, 74; Docket 1-1 at 88, 126, 166. Ward filed a grievance; Kathleen responded and justified Espinoza's behavior. Docket 1 at 21. Ward appealed the grievance; Munsch and Yantis ignored the fact that he was denied lunch and explained that he had received breakfast. *Id.* at 21–22. Ward also spoke with Wilson, and Wilson allegedly stated that the jail has a custom of applying cruel and unusual punishment to inmates who exercise their rights. Docket 1-1 at 99–102.

On August 9, 2023, Ward filed a complaint about his kosher diet because he had been given rotten pouches and watered-down peanut butter. Docket 8 at 4; *see also* Docket 1-1 at 167 (alleging that these events occurred between July 18, 2023, through August 14, 2023). Administrative staff informed him that they would look into the allegedly rotten pouches. Docket 8 at 4. Ward filed over five complaints about rotten pouches and watered-down peanut butter. *Id.*

On August 24, 2023, Ward filed a request for holiday meals on Rosh Hashanah, Yom Kippur, and Sukkot. Docket 8 at 4. On September 14, 2023, administrative staff denied Ward's requests for holiday meals. *Id.* Ward filed grievances about denial of holiday meals. *Id.* at 4–5. Kathleen allegedly told Ward that he cannot "file a greivence [sic] about his religious meals being

---

[7] Ward claims that Sergeant Tenled was involved with Ward's food being thrown away, but Tenled is not named as a defendant. *See* Docket 1 at 2; Docket 1-1 at 91–92.

denied, and if he does so again will be subject to lockdown." *Id.* at 5. Kathleen also barred him from filing grievances and threw his grievances out. *Id.*

Ward claims that USM, Rapid City, Pennington County, TSG, Thom, Mueller, Yantis, Munsch, Kathleen, and Espinoza were personally involved in his receipt of inadequate nutrition or denial of his right to free exercise of his religion or were aware of the violations of his rights because he filed grievances on April 5, 2022; September 2, 2022; September 27, 2022; October 5, 2022; November 10, 2022; and August 3, 2023. Docket 1 at 23–27. He sues USM, Rapid City, Pennington County, TSG, Thom, Mueller, Yantis, Munsch, and Kathleen for violating his rights under the First and Eighth Amendments. *Id.* He sues Espinoza for violating his rights under the Fourteenth Amendment. *Id.* at 27.

**B.    Mail**

While detained at the PCJ, Ward mailed discovery requests related to his criminal case. *Id.* at 28. Ward sent discovery requests to the Attorney General's Office, Rapid City Police Department, and South Dakota Highway Patrol, but the discovery requests were returned the same day. *Id.* On April 7 and 10, 2022, Ward filed grievances because the discovery requests were opened and returned without being sent out by jail staff. *Id.* Ward believed that they should have been sent for free because he thought that PCJ policies provide that inmates and detainees were not charged a fee to send legal mail. *Id.*; Docket 1-1 at 20. Kathleen responded to Ward's grievance and informed him that all mail is opened but agencies may have their own policies. Docket 1 at 28;

Docket 1-1 at 20. Ward appealed Kathleen's response, but the appeal was denied. Docket 1 at 29. Munsch responded to another of Ward's grievances and "bare[d] [Ward] the ability to appeal." *Id.*

In late July 2022, Ward sent as legal mail a letter to the American Civil Liberties Union (ACLU) office in Sioux Falls, South Dakota, and a letter the National Association for the Advancement of Colored People (NAACP). *Id.* at 29, 57, 72; Docket 1-1 at 21, 164, 176. The letters were returned, and Ward put stamps on the letters and mailed them. Docket 1 at 29, 57, 72; Docket 1-1 at 164. Two days later, Ward received back his letter to the ACLU, which was opened and stamped to return to sender. Docket 1 at 29, 57; Docket 1-1 at 122, 164, 177. Ward claims that it was not possible for his letter to be sent to the ACLU, opened, and returned to him within twenty-four hours. Docket 1 at 57. Ward alleges that Welch was the staff member who denied mailing his letters to the ACLU and NAACP. *Id.* at 29, 72; Docket 1-1 at 21. Ward claims that he was singled out because his mail was messed with, and other pretrial detainees did not have similar issues. Docket 1 at 57–58.

On September 27, 2022, Ward filed complaints with the Food and Drug Administration (FDA), TSG, the Rapid City County Commissioner's Office, and the Rapid City Mayor's Office. *Id.* at 29. Afterwards, Yantis, Munsch, and Kathleen stopped his subscription to Prison Legal News and Criminal Legal News because he had filed grievances. *Id.* at 29, 58. Kathleen told Ward the subscriptions were approved, but he never received the magazines. *Id.* at 29.

On December 30, 2022, Ward complained to jail staff that he had
received a judgment by this Court that was opened outside of his presence and
xeroxed, instead of being treated as legal mail. *Id.* at 30. Welch informed Ward
that a court judgment was not considered legal mail. *Id.*

Ward later was sent letters related to his schooling at Blackstone
Institute, but he informed Welch and Munsch that he did not want the letters
inside the jail because they contained personal information that may be used
against him. *Id.* While Ward's request was under review, he asked if the mail
could be returned, placed in his personal property, or forwarded to his P.O.
box. *Id.* Munsch said that would not be a problem, which Ward claims was a
verbal contract. *Id.* Welch told Ward that mail could not be forwarded and
informed him that the jail staff will open all mail and give Ward copies. *Id.*
Ward again requested that the mail be returned to sender, but Kathleen
informed him that all mail is processed the same and that his request is
denied. *Id.* at 30–31. Ward claims that he entered into a verbal contract with
Munsch about his mail and that Munsch breached the verbal contract by
agreeing with Kathleen's response. *Id.* at 31. Ward filed a grievance about these
concerns, but Yantis denied the grievance because it contained more than one
issue, which Ward claims was pretext. *Id.*

On June 2, 2023, through August 3, 2023, Welch, Madison, Yantis,
Munsch, and Kathleen prevented Ward from corresponding with the Colorado
Child Protection Ombudsman about the care and custody of his two daughters.
*Id.* at 31–32, 59, 74; Docket 1-1 at 127, 166, 192. Ward claims that the

defendants actions violated the PCJ's handbook. Docket 1 at 31–32. Welch, Madison, Yantis, Munsch, and Kathleen also prevented Ward from corresponding with his attorney, Darren Jankord. Docket 1 at 32, 59, 74; Docket 1-1 at 152, 167. Madison sent Ward a notice that his mail from Jankord was denied because it was marked as inmate-to-inmate correspondence. Docket 1 at 32; Docket 1-1 at 194, 196–98. Munsch stated that Jankord's mail to Ward was not labeled as from an attorney, which is why the mail was denied. Docket 1 at 33. Ward filed a grievance about denial of his mail, but Yantis responded that this was not a "grievable" issue. *Id.*

Ward claims that USM, Rapid City, Pennington County, Thom, Mueller, Yantis, Munsch, Kathleen, Welch, and Madison were personally involved in denying his right to send and receive mail or were aware of the alleged violation of his right because he filed grievances on April 5, 2022; September 2, 2022; September 27, 2022; October 5, 2022; November 10, 2022; and August 3, 2023. *Id.* at 35–39. He claims that USM, Rapid City, Pennington County, Thom, Mueller, Yantis, Munsch, and Kathleen violated his rights under the First, Sixth, Eighth, and Fourteenth Amendments; he claims that Welch and Madison violated his rights under the First, Sixth, and Fourteenth Amendments. *Id.* Ward alleges that because of defendants' actions he was denied mail from government agencies about his daughters' wellbeing, prevented from sending mail to the ACLU, and prevented from sending mail to his attorney. *Id.* at 39. He also suffered from mental anguish and emotional distress. *Id.*

14

C.    **Medical Care**

Between May through September 2022, Ward obtained a knee injury. *Id.* at 40. The jail staff conducted an x-ray on Ward's left knee, and he was provided stretches to perform. *Id.* An outside provider conducted an x-ray on Ward and determined that Ward has an abnormality in his knee that caused pain but was otherwise normal. *Id.* He was prescribed stretches for his knee and was later prescribed stretches that focused on strengthening his hip. *Id.* The outside provider instructed Ward to stop the stretches if he felt pain or see a doctor if he felt a pinch. *Id.* He was provided an ice pack and Tylenol to manage his pain. *Id.*

Ward complained of pain; Nurse Jane Doe ignored the outside provider's orders and told Ward to keep doing the stretches because his pain "was just the body getting use to the workout." *Id.* at 41. Ward expressed that he needed to see a doctor for the pain, but Nurse Jane Doe said that he would have to wait a long time to see a doctor. *Id.* Ward's hip flexor tore two-to-three days later as an indirect result of Jane Doe's actions. *Id.* at 41, 58 (claiming that Ward injured his hip between October 30, 2022, and November 8, 2022). Shortly after his injury, Ward was seen by a doctor, who recommended that Ward stretch, get an MRI taken, and have eight-to-ten weeks of intense therapy for his hip. *Id.* at 58.

Ward claims that medical treatment was very delayed. *Id.* at 58, 74. He was told that medical care was delayed because of the USM. *Id.* at 58. However, another USM pretrial detainee had a leg issue and was provided intensive

15

rehab for six-to-eight weeks for the injury. *Id.* Ward claims that his delay of medical care was based on racial discrimination because he is a person of color, and the other pretrial detainee is white. *Id.* Ward was only provided over the counter pain medication for his hip injury, but other inmates have been provided lidocaine patches and strong pain medication. *Id.*

On November 29, 2022, medical staff informed Ward that he will be tested for a hernia and sexually transmitted diseases (std) to rule things out. *Id.* at 42. On November 30, 2022, Ward followed up with medical because he was in serious pain. *Id.* Ward saw the outside provider, but the jail staff did not relay his injury to the outside provider. *Id.* at 42, 74; Docket 1-1 at 165. The outside provider recommended that Ward relax for eight-to-ten weeks and then conduct an MRI to determine if surgery is needed and begin intensive rehab. Docket 1 at 42; Docket 1-1 at 165.

Besides being contacted about a potential std test, which was not conducted, Ward experienced a delay in treatment and started asking nurses why he was being ignored. Docket 1 at 42. On January 6, 2023, Ward requested pain medication, intensive rehab, and additional imaging. *Id.* Ward's request was forwarded to a doctor, and on January 8, 2023, Ward received a reply informing him that pain management will be implemented. *Id.* On January 25, 2023, Dr. Rachel examined Ward and prescribed him a hot pack. *Id.* On January 29, 2023, a registered nurse informed Ward that he would start physical therapy soon, but Ward was never provided any physical therapy. *Id.* Ward asked every nurse at the PCJ why he was not scheduled for physical

therapy, but the nurses merely replied that he was in USM custody. *Id.* at 43.

Ward claims that a white inmate in USM custody saw an outside provider

multiple times during this period, but Ward was not permitted to see an

outside provider. *Id.* at 43, 58, 74; Docket 1-1 at 149.

On March 27, 2023, Ward had a follow up for his pain management.

Docket 1 at 43. He was prescribed hot packs and informed that new stretches

were coming, but Ward never received new stretches or exercises. *Id.*

On April 12, 2023, an outside provider performed an MRI on Ward. *Id.*

Ward requested a medical contrast exam. *Id.* The doctor or radiologist stated

that a medical contrast exam was not needed, and employees of the Pennington

County Sheriff's Office did not intervene. *Id.* When the radiologist saw Ward,

the radiologist expressed concern about how Ward was walking and stated that

maybe he should have used the contrast, but the radiologist thought the injury

was different based on the information provided. *Id.*; Docket 1-1 at 66–68.

During morning med pass the next day, Ward informed the nurse of the

radiologist's comments. Docket 1 at 43. On that same day, Ward received an

email informing him that the MRI results showed no abnormalities. *Id.* Ward

responded to the email and described the events of the previous day, claiming

that the problem could have been remedied if the employees of the sheriff's

office spoke up and the correct information was provided to the radiologists. *Id.*

On April 21, 2023, Kathleen directed staff to take away Ward's bucket

used to heat the hot pack he was prescribed. *Id.* at 44, 74; Docket 1-1 at

81–83, 126. Ward claims that Kathleen took away the bucket in retaliation for

a grievance he filed about jail staff interfering with his religion. Docket 1 at 44, 74. Ward asked a nurse about the issue during med pass, and the nurse informed him that she will look into it. *Id.* at 44; Docket 1-1 at 78–79. Ward spoke with the same nurse the next day, but a correctional officer interrupted the conversation and started talking about the issue. Docket 1 at 44; Docket 1-1 at 85–86. On April 28, 2023, a registered nurse emailed Ward and approved the bucket. Docket 1 at 44. On May 12, 2023, Ward's bucket was taken again after he filed a grievance about an unrelated issue. *Id.* at 44, 74. After showing that he had permission to use the bucket, Ward's bucket was returned. *Id.* at 44. After a series of phone calls, Munsch, Kathleen, and Dr. Rachel told Ward that he cannot use the bucket. *Id.* at 44, 74. On May 12, 2023, Ward had a follow up appointment; during the appointment, he asked about the bucket and why it was taken. *Id.* at 44. On May 16, 2023, a registered nurse told Ward that the bucket was not for use. *Id.*

On June 7, 2023, Dr. Rachel examined Ward's hip and potential hernia. *Id.* at 45. Ward mentioned the issue of Kathleen and other staff having a say in his treatment and asked about receiving pain management and a glucosamine supplement. *Id.*; Docket 1-1 at 104–05. On June 13, 2023, a nurse informed Ward that Flexeril will be provided but that glucosamine was not approved by the USM. Docket 1 at 45. On July 1, 2023, Ward saw an outside provider, who advised that an MRI or cat scan needed to be taken before Ward was treated. *Id.* The outside provider noted some improvement but expressed concern about the areas still causing Ward pain. *Id.*

18

On July 3, 2023, Ward requested an extra mattress or blanket for his hip and asked about a potential infection in his toe. *Id.* A few days later, a nurse administered antibiotics to Ward for his foot and recommended that he receive additional two blankets. *Id.* Ward was approved for antibiotics, a foot soak, and two blankets. *Id.*

On July 18, 2023, Ward took his medication and used the foot soak, but he forgot a bandage. *Id.* at 46. Ward asked Camren for a bandage, and she said that she would bring it on her next round. *Id.*; Docket 1-1 at 114, 119. When Ward had not received the bandage two hours later, he yelled "why don't you get up and quit be [sic] lazy." Docket 1 at 46; *see also* Docket 1-1 at 114, 119, 128. Camren called for assistance; Reichert responded and ordered Ward to put his hands behind his back and threatened him with a taser. Docket 1 at 46; Docket 1-1 at 115, 129, 155. Ward was moved to cell block six, cell five. Docket 1 at 46; Docket 1-1 at 160–61. On this same day, Ward had his medical soap for his toe infection, blankets for his hip, and his hot pack taken away from him. Docket 1 at 60. Ward wrote a grievance to classification and medical because he was being retaliated against by not providing him pain management. *Id.* at 46. Ward was also informed that his request for a dental visit was ignored. *Id.*

On July 28, 2023, Ward filed a grievance with medical about blankets, hot pack, and soap for his toe infection. *Id.* On July 31, 2023, a nurse responded to his grievance and informed him that the blankets were removed

19

as a security issue. *Id.* at 47. On August 1, 2023, Ward complained about how command staff have made decisions related to his medical care. *Id.*

On August 2, 2023, Ward asked about antibiotics for his toe because they were supposed to start the prior week. *Id.* Medical staff informed Ward that he could have the infected nail removed. *Id.* Ward agreed to the nail removal but asked if there were any alternatives. *Id.* Medical staff did not provide any alternatives. *Id.*

On August 9, 2023, Ward filed a grievance about his hip injury and requested that his pain medication be extended. *Id.* at 47, 75; Docket 8 at 6. Ward claims that the same day he was moved to a cell where the television cannot be seen in retaliation for filing a grievance. Docket 1 at 47. Kathleen later responded to Ward's grievance informing him that he is in USM custody and must wait until the USM approved his medical care. *Id.* at 48, 75; Docket 8 at 6. Kathleen also stated that Ward's items for pain management were taken because of his behavior. Docket 8 at 6. Ward filed an appeal. *Id.*

On August 25, 2023, Ward was taken to an outside provider, who did not specialize in hip repairs or muscle fixes. *Id.* The outside provider reviewed Ward's MRI and determined it looked normal. *Id.* The outside provider also recommended an injection for Ward's hip. *Id.* On August 28, 2023, Ward wrote to medical, complaining that the outside provider was not a specialist in the kind of treatment he received. *Id.*

On September 6, 2023, Ward filed a grievance about his medical care and failure to address his prior grievances. *Id.* at 7; Docket 1 at 48. On

20

September 7, 2023, Kathleen told Ward that he had not appealed so if he continued to file grievances about his medical issues then he would be punished. Docket 1 at 48; Docket 8 at 7. Ward filed an appeal that same day. Docket 1 at 48. Munsch responded to Ward's appeal on September 14, 2023, and informed Ward that he had been given medical treatment and sent him to a medical specialist. Docket 8 at 7. Ward filed another appeal on the same day complaining that the medical specialist he was sent to did not specialize in hip or muscle issues. *Id.* On September 20, 2023, another MRI was conducted on Ward's hip, and the technician informed Ward that treatment should start soon based on a decision from the specialist. *Id.* at 8.

Ward filed another grievance on October 1, 2023, because defendants violated PCJ policy when they had not responded to his appeal in fifteen days. *Id.* Kathleen threatened to lockdown Ward for filing a grievance. *Id.* On October 11, 2023, Yantis informed Ward that he has received medical treatment and does not have a current issue needing to be addressed. *Id.* The same day a nurse informed Ward that he had a labral-hip tear and that treatment will be issued by a doctor. *Id.* The next day Ward was taken off Tylenol pain medication and provided no pain medication in retaliation for filing a grievance. *Id.*

Ward claims that USM, Rapid City, Pennington County, Mueller, Yantis, Munsch, Kathleen, Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, and Megan were individually involved in his medical treatment or were aware of his medical concerns because of his grievances and were deliberately indifferent to

21

his medical needs. *See* Docket 1 at 50–56. He sues USM, Rapid City, Pennington County, Mueller, Yantis, Munsch, Kathleen, Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, and Megan for violation of his rights under the Eighth and Fourteenth Amendments. *Id.*

### D.    Retaliation and Equal Protection

Ward claims that he and other Jewish, Muslim, and Israelite inmates are treated differently than Christian inmates. *Id.* at 57. Ward filed multiple requests and grievances seeking access to clergy, assembly with other members of his religion, and religious meals; Ward's requests have been denied despite Christian inmates receiving these privileges. *Id.* He claims that Yantis, Munsch, and Kathleen deprived him and other pretrial detainees from the ability to follow their religious beliefs. *Id.*

Between April and July 2022, Ward filed multiple grievances about denial to practice his religion, legal mail, and hygiene supplies for minority inmates. *Id.* "Almost immediately after [Ward] started filing greivences [sic] on issues related to religious [sic] and mail he suffered daily cell searches" by Munsch and Kathleen's command. *Id.* at 72; *see also id.* at 14–15, 57, 73 (claiming that he was singled and subjected to cell searches because he filed grievances); Docket 1-1 at 122. Particularly, on July 29, 2022, Correctional Officer Bettelyoun searched Ward's cell, but Bettelyoun only looked through his legal documents. Docket 1 at 14; Docket 1-1 at 33–34, 164 (alleging that the officer searched his cell at the direction of Munsch and/or Kathleen). The next day Ward filed a grievance about the cell search claiming that it was part of a

pattern of retaliation for exercising his constitutional rights. Docket 1 at 14;
Docket 1-1 at 27. On August 4, 2022, Correctional Officer Stenton searched
Ward's cell and messed with his legal papers. Docket 1 at 15, 73. Ward later
spoke with Stenton and told her that she was not permitted to read his legal
papers; thirty minutes later, Stenton showed Ward the rule book. *Id.* at 15;
Docket 1-1 at 40–41. When Ward told Stenton that it did not matter if that was
prohibited in the rules, Stenton allegedly got nervous and stated that "she was
told to search [Ward's] cell and to read through documents." Docket 1 at 15;
*see also* Docket 1-1 at 41, 164. He filed a grievance about Stenton searching
his cell in retaliation, but Kathleen responded, informing him that cell searches
are random, which Ward refutes. Docket 1 at 16. Munsch responded to
another grievance and told Ward that it is policy for staff to search cells and go
through legal documents, and Yantis informed Ward that "prisoners don't have
Fourth Amendment Rights." *Id.*

During a hearing on November 2, 2022, Ward complained about
treatment at the jail and the jail providing him meals that contain pork fat
despite him adhering to a kosher diet. *Id.* at 73. On November 26, 2022, Ward's
cell was destroyed during a cell search by Correctional Officer Stevenson in
retaliation for informing the USM of his concerns. *Id.*; Docket 1-1 at 46–47,
165.

On September 8 or 9, 2022, during evening med pass when Ward
received medication for a skin condition, Megan was "racially inappropriate" to
Ward and did not want to treat him because of his race. Docket 1 at 40, 58; *see*

*also* Docket 1-1 at 30, 43–44. Moore allegedly attempted to prevent Ward from filing a grievance because of racial discrimination. Docket 1-1 at 13. Ward filed a grievance about Megan the next day. *Id.* at 30; Docket 1 at 41. Megan began being sent to Ward's cellblock, and Ward and other inmates were uncomfortable because of her prior behavior. Docket 1 at 41, 58; Docket 1-1 at 165. On October 28, 2022, Ward filed a grievance about the jail being short-staffed and condoning Megan's conduct. Docket 1 at 41. Yantis, Munsch, and Kathleen told Ward that he had no choice but to get his medicine from Megan. *Id.* at 58. On November 4, 2022, Ward appeals his grievance because the issue had been occurring for two months and Megan should not have been interacting with inmates. *Id.* at 41. On November 9, 2022, Munsch responded to Ward and indicated that Ward's response was not timely, but Ward claims that Munsch's response was merely pretext to "ignore the valid complaint of greivence [sic]." *Id.* Ward appealed the response to his grievance on the same day. *Id.* at 42. On November 18, 2022, Yantis informed Ward that the reason he was having difficulty appealing was because he did not follow the grievance procedures. *Id.* Yantis also informed Ward that it is Ward's "job to be an inmate and [Yantis's] job to run the jail and [Ward] can't tell him how to handle his staff and whatever discipline [Megan] got or didn't [he's] not worry about it." *Id.*

On July 18, 2023, Ward was accused of threatening Camren and was placed in administrative segregation. *Id.* at 59; Docket 1-1 at 119–20. He was only allowed outside of his cell for a total of four hours during the two-week period in segregation. Docket 1-1 at 139. While in segregation, Ward was

24

stripped of his legal papers and denied access to the law library. *Id.*; Docket 1 at 75. When Ward received his legal papers back, he noticed that several items were missing. Docket 1-1 at 142. He claims that Reichert read his legal papers and removed documents that would negatively impact him. *Id.*

Ward was not provided a hearing, despite PCJ policy stating that he was entitled to a hearing within five days. *Id.* at 129; Docket 1 at 59. Ward claims that the real reason that he was placed in administrative segregation was in retaliation for filing grievances. Docket 1 at 59. Ward alleges that Yantis, Munsch, and Kathleen kept him in administrative segregation as a punishment because there was no evidence for him to be proven guilty at a hearing. *Id.*; Docket 1-1 at 167. Ward claims that this violated his right to Equal Protection because other inmates were treated differently than Ward. Docket 1 at 59. For example, two white pretrial detainees who were accused of fighting were provided a hearing within five days. *Id.*; Docket 1-1 at 116. Ward claims that another inmate said threatening words to staff members and was in lockdown for five days and was provided a hearing. Docket 1 at 59.

Ward was transferred to maximum security. *Id.* at 60. He claims that there is a classification meeting every Wednesday to discuss lowering inmates' security level. *Id.*. All committee members, except Kathleen, voted to lower his security level, but his security level was not lowered for four weeks. *Id.* Ward did not have any write ups, but inmates in the same pod on the same level who had writes ups had their security levels lowered. *Id.*

25

Ward claims that USM, Rapid City, Pennington County, Thom, Mueller, Yantis, Munsch, Wilson, Kathleen, Reichert, Madison, Welch, Camren, Megan, Scott, Espinoza, Dr. Jane/John Doe, and Dr. Rachel were personally involved with retaliation or discrimination against him or were aware of the retaliation and discrimination because he filed written complaints about the retaliation and discrimination on April 5, 2022; September 2, 2022; September 27, 2022; October 5, 2022; November 10, 2022; and August 3, 2023. *Id.* at 61–64, 66–71, 77–85.

Ward claims that USM, Rapid City, Pennington County, Thom, Mueller, Yantis, Munsch, and Kathleen discriminated against him in violation of his rights under the First, Sixth, Eighth, and Fourteenth Amendments. *Id.* at 61–64, 66–67, 77–81. He claims that Reichert violated his rights under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments. *Id.* at 65, 67, 81–82. He also claims that Camren violated his rights under the Fourth, Sixth, and Fourteenth Amendments. *Id.* at 68, 85. He alleges that Madison and Welch violated his rights under the First, Sixth, and Fourteenth Amendments. *Id.* at 67–68, 82. He claims that Wilson, Dr. Jane/John Doe, and Dr. Rachel violated his rights under the Eighth and Fourteenth Amendments. *Id.* at 66, 69–71, 80–81, 83–84. He alleges that Megan and Espinoza violated his rights under the Fourteenth Amendment. *Id.* at 69, 82. He claims that Moore violated his rights under the Fifth and Fourteenth Amendments. *Id.* at 69.

### E.    Access to Court

On March 25, 2022, a detainer was issued against him in Colorado, but he was not given notice. *Id.* at 86. On April 21, 2022, Ward was placed in USM custody because of federal charges against him. *Id.* Ward had state charges pending against him in Pennington County, South Dakota, for the same actions. *Id.* Ward claims that both the state court and the federal court violated his right to speedy trial. *Id.*

From April 2022 through May 2023, Ward was continually unable to make phone calls, especially to his attorneys. *Id.* When Ward was able to contact his attorneys in May 2023, all phone calls were recorded. *Id.* On November 2, 2022, Ward raised concerns about denial of his right to access the court during his suppression hearing. *Id.* at 89–92; Docket 8 at 10. Ward also filed grievances and complaints about his denial of access to the courts on April 5, 2022; September 2, 2022; October 5, 2022; November 10, 2022; February 10, 2023; April 3, 2023; August 3, 2023; and August 24, 2023. Docket 1 at 89–92; Docket 8 at 10. Ward claims that his grievances informed the USM, Rapid City, Pennington County, Thom, Mueller, Yantis, Munsch, and Kathleen about the denial of his right to access the court. Docket 1 at 89–92.

Between October and November of 2022, the Colorado Department of Human Services contacted the USM and the Federal Bureau of Prisons to locate Ward. *Id.* at 87. Despite Ward being in the USM's custody, he was not notified that his daughters were in danger. *Id.*

27

Ward claims that defendants denied him access to virtual writs about his daughters' custody on several occasions. On April 8, 2023, a juvenile court in Denver, Colorado, issued a virtual writ for Ward to appear, but the PCJ and the USM did not allow him to appear. *Id.* at 87. On April 25, 2023, Ward was scheduled for another virtual writ before the juvenile court in Denver, but the PCJ and the USM did not allow him to appear. *Id.* On July 26, 2023, the PCJ and the USM did not allow him to appear for his virtual writ to the juvenile court in Denver. *Id.* at 88. On September 14, 2023, the PCJ did not allow Ward to appear for a virtual writ. Docket 8 at 10. Ward claims that Yantis should have known that the Colorado Department of Human Services was trying to contact him and that virtual writs had been issued. Docket 1 at 92. When Ward filed a grievance about not being permitted to attend virtual writs, Munsch responded and informed Ward that because Ward is in the USM's custody, the USM are responsible to answer writs, not the PCJ. *Id.* at 88; Docket 8 at 10.

On June 30, 2023, Ward's attorney, Darren Jankord, visited him at the PCJ. Docket 1 at 32, 87. After meeting with Ward, Jankord complained of the problems impeding access to the court, including that the phone calls with attorneys are recorded and the difficulty to help Ward with his case. *Id.* at 87. On the same day, Ward received mail from Jankord, but Madison returned the mail to sender, despite the mail indicating that it was sent from an attorney. *Id.* On July 18, 2023, Reichert went through Ward's legal papers and disposed of several items. *Id.*; *see also* Docket 1-1 at 112, 166 (claiming that Ward's papers

were searched on July 17, 2023). Reichert also prevented Ward from accessing legal documents that needed to be filed to assist in his criminal defense. Docket 1 at 87.

Ward claims that USM, Rapid City, Pennington County, Thom, Mueller, Yantis, Munsch, Kathleen, and Reichert violated his First, Sixth, Eighth, and Fourteenth Amendment rights because of their failure to provide access to the courts. *Id.* at 65, 89–92. He claims that Madison violated his rights under the First, Sixth, and Fourteenth Amendments. *Id.* at 65.

### F.    Claims and Relief Requested

Ward sues Thom, Mueller, Yantis, Munsch, Kathleen, Wilson, Reichert, Moore, Espinoza, Camren, Welch, Madison, Dr. Jane/John Doe, Dr. Rachel, Megan, and Jane Doe (collectively "employees") are sued in their individual capacities. *Id.* at 3, 5–6, 8; Docket 8 at 1–2. Ward sues USM,[8] Rapid City, Pennington County, and TSG in their individual and official capacities. Docket 1 at 8; Docket 8 at 1. Ward alleges claims arising from violations of his rights under the Federal Tort Claims Act (23 U.S.C. § 1402), Religious Land Use and Institutionalized Person Act (42 U.S.C. §§ 2000cc through 2000cc-5), Religious Freedom Restoration Act (42 U.S.C. §§ 2000bb through 2000bb-4), as well as the First, Fourth, Fifth, Sixth, and Fourteenth Amendments. Docket 1 at 8.

---

[8] Ward claims in his complaint that UMS is sued in its individual and official capacities. Docket 1 at 8. He later alleges that USM is only sued in its official capacity. Docket 8 at 1. For the sake of completeness, this Court will consider USM to be sued in its individual and official capacities.

Ward requests injunctive relief against Pennington County, Yantis, Wilson, Munsch, Kathleen, Dr. Jane/John Doe, Dr. Rachel, Madison, and any other staff that had email correspondence about his healthcare, disciplinary actions, grievances, or retaliation to prevent the destruction of such evidence. *Id.* at 94. He requests injunctive relief against the USM, Rapid City, Pennington County, and TSG requiring them to (1) provide "an actual Kosher diet using individual wrapped items instead of bulk items[;]" (2) change or enforce polices to permit him and other pretrial detainees to observe Jewish holidays or similarly situated pretrial detainees to observe Muslim holidays; (3) permit Ward to have time with similar pretrial detainees who are Jewish or Muslim and without non-Jewish people to assemble and study the written law "Torah Shebichtav" or oral law "Torah Shebaal Peh" in the chapel on all Jewish holidays and for Muslim pretrial detainees to have the same; (4) allow for rabbis to come to the PCJ year round; (5) allow the Aleph Institute to send in matza and grape juice every Sabbat as well as other items for Jewish holidays; (6) have a pot and/or microwave for only kosher meals at the PCJ; (7) permit the inmates to have access to order monthly food packages from any kosher vender which the jail should make available; (8) allow Ward and other inmates and pretrial detainees to take religious classes and courses using the jail tablet and/or kiosk; (9) require kosher meals meet proper calorie counts "without fluffers such as butter, sald [sic] dressing that will take 200-300 calories off each meal;" (10) hire a chaplain, rabbi, or imam to ensure Ward and other inmates' religious matters are handled to prevent retaliation; (11) pay Ward for

purposeful retaliation and irreparable injuries caused by defendants continuous deliberate indifference; and (12) order kosher meals to be prepared for holidays moving forward. *Id.* at 94–95.

Ward requests that the Court order the USM to release him on bond to Colorado where he will check in with the USM to receive his release conditions, get his daughters' affairs in order, and meet with his doctor. *Id.* at 95. He also requests that this Court order the USM to pay for intense rehab, images, and surgery, if needed. *Id.* In the alternative, if the Court finds that bond is not warranted, Ward asks the Court to require the USM to (1) move him and every other federal inmate from PCJ to a new facility that complies with all federal laws until all discrimination, mail tampering, retaliation, and religious concerns are addressed and fixed; (2) permit Ward to have access to the courts to attend virtual court writs for his daughters and bond issues; (3) permit Ward to visit his daughters; (4) permit Ward to have access to his attorneys; (5) permit Ward to have intense rehab, images, and surgery for his hip; and (6) permit Ward to have his religious rights, with access to holiday meals and clergy and not to be discriminated against based on his race or religion or for filing a grievance. *Id.* at 95–96. In the alternative that the Court finds neither of his requests against the USM appropriate, he asks the Court order the following relief: (1) require the USM to start intense rehab, conduct images, and surgery on his hip, as well as order him to stay outside of the facility if necessary for is hip to heal properly; (2) require that he be restored back to population without retaliation; (3) require kosher meals to be consistent with

the First Amendment and require that Ward shall be able to have holiday meals with appropriate calorie counts and without retaliation for Rosh Hashanah, Yom Kippur, Sukkot, and Hanukkah; (4) permit Ward to have access to the courts to attend virtual court writs for his daughters and bond issues; (5) permit Ward to have access to his attorneys; (6) permit Ward to have access to his daughters through set up visits; (7) require adequate pain management and other medical things restored; (8) prohibit retaliation by defendants against Ward; and (9) prohibit censorship on Ward's mail and searches that do not serve a penological purpose. *Id.* at 96.

Ward seeks the following injunctive relief against Pennington County and Rapid City: (1) require termination of Yantis, Munsch, and Kathleen[9] and replacement with qualified individuals; (2) require replacement staff and all other staff complete "race base training to ensure rights of pretrial detainees;" (3) require that "[d]efendants will ensure and shall oversee that both federal and state discrimination, Equal Protections, Religious, Access to Court, Right to Communication and all other [c]onstitutional issues are addressed while ensuring both health and safety that again does not discriminate against people for the aforementioned as well as gender[;]" (4) require termination of Dr. Jane/John Doe and Dr. Rachel[10] and replacement with physicians who will

---

[9] If the Court finds that termination of Yantis, Munsch, and Kathleen is inappropriate, Ward requests that Yantis, Munsch, and Kathleen Houston be required to participate for no less than a year in community outreach training that provides race-based training. Doc. 1 at 97–98.

[10] If the Court finds that termination of the physicians is inappropriate, Ward requests that the physicians be ordered to "spend a period no less than [one] year and no more

provide healthcare when needed and will not use medical treatment for retaliation, cause unnecessary delay, ignore obvious conditions, fail to provide treatment for diagnosed conditions, and fail to investigate to make informed judgments; (5) require that pretrial detainees have access to the court, proper religious services, their attorneys, and their families, without discrimination, retaliation, or policies instituted without consistent monitoring; (6) require employment of a chaplain, rabbi, or imam who will ensure that kosher and Halal meal standards are met and will assemble with pretrial detainees in accordance with their constitutional rights; (7) require PCJ to have sufficient staff to allow inmates to have visits and correspond with family; and (8) require that TSG be replaced if it is unable to provide properly cooked kosher meals and comply with dietary restrictions. *Id.* at 96–98.

Ward requests that the Court order TSG to follow proper kosher and halal guidelines for daily meals and holidays and provide specialty diets without retaliation or providing unhealthy food. *Id.* at 98. If TSG cannot follow these orders, Ward requests that the Court order TSG to return the money for the contract bid to provide food services at the PCJ and to allow another company that can follow specialty diets to provide food services. *Id.*

Ward requests against Rapid City, Pennington County, and USM preliminary and permanent injunctive relief or a consent of degree "from directly or indirectly establishing a policy that allows [discrimination against]

---

than three years reeducating involving health care and and [sic] race base [sic] training to ensure their conduct displayed toward [Ward] never happens again[.]" Docket 1 at 97.

minorities and/or people of color whether employed or being housed as pretrial detainees and/or sentenced in accordance to both Federal and State Laws (or just federal if state doesn't provide a proper mandate)[.]" *Id.* He also requests preliminary and permanent injunctive relief requiring "that a no harassment policy coupled with a preventative system that allow members to take necessary race base [sic] training courses and is sensitive to discrimination and retaliation be implemented." *Id.*

Ward requests generally the following preliminary and permanent injunctive relief: (1) order the "restoration of Constitutional Protections or retrials or resentencing for people whom sought deals due to the poor conditions in which [Ward] has suffered and the extreme deprivation of Constitutional right(s) during pretrial detainment at Pennington County Jail[;]" (2) require Pennington County, Rapid City, and USM to submit a plan for a hearing procedure for Ward and other pretrial detainees to seek redress for deprivations of rights, including a lack of "Access to Court, access to counsel, recorded attorney privilege calls, denied 1st Amend protections, searched without a penological interests, prevented from access to clergy, the right to assemble, adequate Kosher or halal meals, retaliated for filing greivences, and placed in Administrative Segregation without a hearing or a written notice[;]" and (3) "damages for these deprivations of civil rights resulting from these constitutional precedures." *Id.* at 98–99 (spelling and grammar errors in original quotation). He also requests compensatory and punitive damages totaling no less than $1.5 million "against all the defendants in an amount

34

sufficient to compensate him for the pain and suffering, mental anguish, retaliation, the denial of access to Court, the denial of mail, delayed medical treatment, lack of medical treatment for non-medical factors, suffered by him due to the deliberate indifference and intentunal misconduct of all defendants[.]" *Id.* at 99 (spelling and grammar errors in original quotation).

## II.    **Legal Standard**

The court must assume as true all facts well pleaded in the complaint when screening a complaint. *Est. of Rosenberg v. Crandell*, 56 F.3d 35, 36 (8th Cir. 1995). Civil rights and pro se complaints must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007*); Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). Even with this construction, "a *pro se* complaint must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (citation omitted); *see also Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013). Civil rights complaints cannot be merely conclusory. *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993) (citation omitted); *Parker v. Porter*, 221 F. App'x 481, 482 (8th Cir. 2007).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). If it does not contain these bare essentials, dismissal is appropriate. *Beavers v. Lockhart*, 755 F.2d 657, 663 (8th Cir. 1985). *Twombly* requires that a complaint's factual allegations must be "enough to raise a right to relief above the speculative level on the assumption that all the

allegations in the complaint are true[.]" *Twombly*, 550 U.S. at 555 (citations omitted); *see also Abdullah v. Minnesota*, 261 F. App'x 926, 927 (8th Cir. 2008) (noting complaint must contain either direct or inferential allegations regarding all material elements necessary to sustain recovery under some viable legal theory (citation omitted)). Under 28 U.S.C. § 1915A, the court must screen prisoner complaints and dismiss them if they "(1) [are] frivolous, malicious, or fail[] to state a claim upon which relief may be granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). This Court will now assess the claims under 28 U.S.C. § 1915A.

## III.   Discussion

### A.   Claims on Behalf of Others

Ward alleges claims on behalf of him and other pretrial detainees and inmates. *See generally* Docket 1. But Ward does not have standing to assert claims on behalf of other inmates and pretrial detainees. "A prisoner cannot bring claims on behalf of other prisoners." *Martin*, 780 F.2d at 1337. Under 28 U.S.C. § 1654, a pro se plaintiff may plead their own cases in federal court, but a pro se plaintiff cannot bring claims on behalf of others. *See Johnson v. Precythe*, 2019 WL 931925, at *1 (E.D. Mo. Feb. 26, 2019) (collecting cases). Thus, Ward's claims on behalf of other pretrial detainees and inmates are dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

**B.    Claims for Injunctive Relief**

Ward requests injunctive relief on his claims. *See* Docket 1 at 94–99. Ward is no longer housed at PCJ. *See* Dockets 10, 14, 15. The Eighth Circuit held that an "inmate's claims for declaratory and injunctive relief are moot when he is transferred to another facility and is no longer subject to alleged unlawful conditions[.]" *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 835 (8th Cir. 2009) (citing *Pratt v. Corr. Corp. of Am.*, 267 F. App'x 482, 482 (8th Cir. 2008) (per curiam)); *see also Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999) (finding that an inmate's transfer to a new facility weeks before a trial for violation of his First Amendment rights mooted his claims for injunctive relief); *Wycoff v. Brewer*, 572 F.2d 1260, 1262 (8th Cir. 1978) (holding that a prisoner's claims for injunctive relief for violation of his Fourteenth Amendment rights were moot when plaintiff was transferred to a different penitentiary). Ward is no longer detained at the PCJ and has been sentenced into the custody of the United States Bureau of Prisons. *USA v. Ward*, 5:22-CR-50073-KES, Docket 337 at 2.[11] Thus, Ward's claims for injunctive relief are moot and are

---

[11] This Court has recognized that the Administrative Procedures Act, 5 U.S.C. § 702, permits claims for injunctive relief against the United States Marshals Service. *Benetti v. United States Marshal Serv.*, 5:22-CV-05038-KES, 2023 WL 5485995, at *3 (D.S.D. Aug. 24, 2023). Ward claims that he is entitled to relief under § 702. Docket 1 at 1. However, when Ward was sentenced, he was remanded to the custody of the USM and committed to the custody of the United States Bureau of Prisons. *United States of America v. Ward*, 5:22-CR-50073-KES, Docket 337 at 2. Ward is currently housed at FCI Mendota, Docket 15, and he does not indicate that he is a USM prisoner. Thus, his claims for injunctive relief against USM are dismissed without prejudice as moot under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### C.     Claims Against the USM for Money Damages

Ward also seeks money damages against the USM for violation of his rights. *See* Docket 1 at 99. Ward sues USM in its individual and official capacity as "a Corporation in the United States of America operating in the County of Pennington in the State of South Dakota." Docket 1 at 8; *see also* Docket 8 at 1. The United States Marshals Service is a bureau of the United States Department of Justice. *See* 28 U.S.C. § 561(a).

"[S]overeign immunity shields the Federal Government and its agencies from suit." *Mader v. United States*, 654 F.3d 794, 797 (8th Cir. 2011) (alteration in original) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). "If Congress so chooses, however, it may waive the United States's sovereign immunity and 'prescribe the terms and conditions on which [the United States] consents to be sued, and the manner in which the suit shall be conducted.' " *Id.* (alteration in original) (quoting *Beers v. State*, 61 U.S. (20 How.) 527, 529 (1857)). "Absent an express waiver of sovereign immunity, money awards cannot be imposed against the United States." *McBride v. Coleman*, 955 F.2d 571, 576 (8th Cir. 1992).

Ward alleges claims arising under the Federal Torts Claims Act (FTCA), 28 U.S.C. § 1346. Docket 1 at 8. This Court liberally construes Ward's complaint to allege a FTCA claim for negligence against the USM. Docket 1-1 at 105. The Eighth Circuit has recognized that a federal agency cannot be sued

under the FTCA. *Duncan v. Dep't of Labor*, 313 F.3d 445, 447 (8th Cir. 2002) (per curiam) (citing *Meyer*, 510 U.S. at 476–77).

The "FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." *McNeil v. United States*, 508 U.S. 106, 113 (1993). Exhaustion is a jurisdictional prerequisite to filing a FTCA claim. *Porter v. Fox*, 99 F.3d 271, 274 (8th Cir. 1996). Exhaustion requires that the plaintiff "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675(a). Under 28 C.F.R. § 14.2(a), a claim is "deemed to have been presented" when the agency receives "an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property[.]" "The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section." 28 U.S.C. § 2675(a). "Section 2675(a) simply states that at any time after a claim has been before the government agency for six months and no action has been taken by that agency, the claimant may treat the claim as denied for the purposes of exhaustion of administrative remedies." *Stahl v. United States*, 732 F. Supp. 86, 88 (D. Kan. 1990) (citing 28 U.S.C. § 2675(a)).

Under the "Exhaustion of Administrative Remedies" heading in Ward's complaint, he stated that he has followed all rules of the Prison Litigation

Reform Act and wrote "See Exhaustion of Administrative Remedies Affidavit, Exhibit 2, also see FTCA Form." Docket 1 at 9. Ward filed nearly two-hundred pages of exhibits, and this Court is unable to find an "Exhaustion of Administrative Remedies Affidavit" or a "FTCA Form" in the exhibits. *See generally* Docket 1-1. Ward submitted copies of grievances that were not taken and labeled it as "Proof of Administrative Remedies[,]" but it appears that all of the grievances were filed with the PCJ and do not contain a request for certain sum for injury. *Id.* at 17–30.

Ward claims that he sent letters to the USM on September 2, 2022; October 5, 2022; and November 10, 2022.[12] *Id.* at 170; Docket 1 at 9, 23, 35, 50, 61, 77, 89. Ward attached one letter to the USM to his complaint, but the letter does not contain a specific request for money damages. Docket 1-1 at 181–82. The letter also only identified that he had claims for violations of his rights under the First, Sixth, Eighth, and Fourteenth Amendments and does not mention negligence for his medical treatment of his knee or hip. *Id.* He does not fully explain the content of the other letters, nor does he allege that his letters contained a request for money damages. *See generally* Dockets 1, 1-1. Because Ward has not alleged sufficient facts for this Court to determine it has

---

[12] Ward also sent letters to the United States Department of Justice (DOJ) on July 27, 2023, and the FDA on November 27, 2022. Docket 1 at 9. However, Ward does not indicate that he received a response from the DOJ, and he did not wait six months without receiving a response from the DOJ before filing suit. *Id.* In response to Ward's letter to the FDA, the FDA told Ward to contact the South Dakota Prison Board. *Id.*

jurisdiction over Ward's FTCA claim, his FTCA claim is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).[13]

If Ward believes that he has properly exhausted his administrative remedies under the FTCA before filing this lawsuit, Ward may file an **amended complaint within thirty days from the date of this screening order** naming the United States as a defendant under the FTCA and alleging sufficient facts to show that he has exhausted his FTCA claim before he filed this lawsuit.[14]

Ward does not allege any other ground that waives sovereign immunity against USM. *See generally* Dockets 1, 1-1. Thus, Ward's claims against the USM are barred by sovereign immunity; Ward's claims against the USM in its individual and official capacities for money damages are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

### D.    Claims Against Rapid City

Ward sues Rapid City generally for its failure to oversee and investigate the PCJ and its employees, policies, and procedures. Docket 1 at 23, 35, 50, 61–62, 77, 89. But county jails in South Dakota are overseen by the county,

---

[13] Claims under the FTCA can only be brought against the United States. 28 U.S.C. § 1346. Thus, Ward's FTCA claims against Rapid City, Pennington County, and PCJ employees are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

[14] When filing an amended complaint, Ward must comply with the Federal Rules of Civil Procedure and this Court's local rules. The local rules require "any party moving to amend a pleading must attach a copy of the proposed amended pleading to its motion to amend with the proposed changes highlighted or underlined so that they may be easily identified." D.S.D. Civ. LR 15.1. "[A]n amended complaint supercedes [sic] an original complaint and renders the original complaint without legal effect." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 928 (8th Cir. 2005) (citing *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir 2000)). Thus, all claims that Ward seeks to bring against the defendants must be included in an amended complaint.

not a city. *See* SDCL § 24-11-2 ("There shall be established and maintained in every county, by authority of the board of county commissioners and at the expense of the county, a jail for the purposes stated in this chapter, except as provided in § 24-11-3."). Thus, he has not alleged claims for anything within Rapid City's control. Ward does claim that he was originally arrested by the "Highway Patrol, Rapid City Police." Docket 1-1 at 20; *see also* Docket 1 at 28–29. However, Ward does not appear to allege any claims arising from his original arrest, instead, he claims that "High Patrol Rapid City Police Department is a part of Pennington County Jail[.]" Docket 1-1 at 20.

Standing is a "threshold question in every federal case, determining the power of the court to entertain suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of a controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.* at 498–99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). In order to possess standing to bring a claim in federal court, a plaintiff must show

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Because Pennington County, not the City of Rapid City, oversees the

PCJ, Ward has not alleged an injury fairly traceable to Rapid City. Thus, Ward's claims against Rapid City are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### E.    Other Claims for Money Damages

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

> Thus, each Government official . . . is only liable for his or her own misconduct. As we have held, a supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.

*Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (cleaned up). Ward's individual capacity claims must allege that each individual defendant either participated in the unconstitutional conduct or caused the conduct to occur through a failure to train or supervise the offending actor.

### 1.    First Amendment

#### a.    Free Exercise

Ward alleges claims for violation of his rights under the First Amendment free exercise clause against Pennington County, TSG, Thom, Mueller, Yantis, Munsch, and Kathleen. Docket 1 at 23–27. In order to state a First Amendment free exercise claim, Ward must allege facts showing that prison officials have substantially burdened the free exercise of his religion. *Patel v. U.S. Bureau of*

*Prisons*, 515 F.3d 807, 813 (8th Cir. 2008). Substantially burdening the free exercise of religion means that the regulation

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.

*Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) (cleaned up).

### (i).    Claims Against Employees

Ward claims that Thom, Mueller, Yantis, Munsch, and Kathleen were involved with violation of his First Amendment right to free exercise because they denied him adequate kosher meals, did not allow him to assemble with people of similar religious beliefs, and did not allow him to access clergy. Docket 1 at 23–27. Ward alleges that because of these defendants' actions he was not able to observe religious holidays, eat meals that comply with his religion, assemble with inmates and pretrial detainees with similar beliefs, and meet with clergy. *Id.* at 27. Thus, Ward has alleged sufficient facts for his First Amendment free exercise claims against Thom, Mueller, Yantis, Munsch, and Kathleen in their individual capacities for money damages to survive § 1915A screening.

### (ii).    Claims Against Pennington County and TSG

Ward sues Pennington County for violating his First Amendment free exercise rights. "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A county or local government may only be sued

"when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," deprives a plaintiff of a federal right. *Id.*

To establish governmental liability premised on an unofficial custom rather than an official policy, a plaintiff must allege facts to support a finding of "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees" and "deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct[.]" *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (quoting *Corwin v. City of Independence*, 829 F.3d 695, 700 (8th Cir. 2016)). A § 1983 complaint does not need to "specifically plead the existence of an unconstitutional policy or custom to survive a motion to dismiss." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (citing *Doe ex rel. Doe v. Sch. Dist.*, 340 F.3d 605, 614 (8th Cir. 2003)). But the complaint must include some allegation, reference, or language that creates an inference that the conduct resulted from an unconstitutional policy or custom. *Id.*; *see also Doe*, 340 F.3d at 614 ("At a minimum, a complaint must allege facts which would support the existence of an unconstitutional policy or custom.").

Ward sues Pennington County for violation of his First Amendment right to free exercise because he was not provided adequate kosher meals, not allowed to assemble with people who share the same religious and spiritual beliefs, and not allowed access to clergy. Docket 1 at 24. Ward claims that PCJ

administrative staff had a policy and custom that denied Ward his right to access clergy, to assemble with members of his religion, and to obtain meals that complied with his religion. Docket 1-1 at 57. Thus, Ward has alleged sufficient facts for his claim for violation of his First Amendment right to free exercise against Pennington County in its individual and official capacities for money damages to survive § 1915A screening.

Ward also sues TSG, which contracted with Pennington County to provide food service in the jail. Docket 1 at 8. Under § 1983, a corporation cannot be held vicariously liable for the acts of its employees. *Burke v. N.D. Dep't of Corr. & Rehab.*, 294 F.3d 1043, 1044 (8th Cir. 2002) (per curiam) (citing *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975–76 (8th Cir. 1993)). Corporations acting under § 1983 will only be liable for their own unconstitutional policies; "[t]he proper test is whether there is a policy, custom or action by those who represent official policy that inflicts injury actionable under § 1983." *Sanders*, 984 F.2d at 975–76 (citing *Monell*, 436 U.S. at 690, 694).

He claims that TSG violated his First Amendment right to free exercise because it failed to provide adequate kosher meals and holiday meals. Docket 1 at 24. For the purposes of screening, his complaint could be liberally construed to allege an unofficial custom of providing meals that do not comply with the kosher diet. *Id.* He claims that TSG was aware of and deliberately indifferent to the violation because he filed complaints about the food not being kosher, which Ward claims substantially burdened his religious exercise. *Id.* Thus,

Ward's First Amendment free exercise claim against TSG in its individual and official capacities for money damages survives § 1915A screening.

**b.    Establishment Clause**

Liberally construing Ward's complaint, he alleges a violation of his rights under the First Amendment establishment clause because meals are provided for Christian holidays but not Jewish or Muslim holidays. Docket 1 at 20; Docket 1-1 at 55. "[A]t a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise[.]" *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (citing *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984)). In order to have standing to bring an Establishment Clause claim, a plaintiff may either have standing as a taxpayer or establish "an injury of direct and unwelcome personal contact with the alleged establishment of religion." *Patel*, 515 F.3d at 816 (citations and internal quotation omitted). "Prisoners may establish an injury if they 'allege they altered their behavior and had direct, offensive, and alienating contact with' a government-funded religious program." *Id.* at 817 (quoting *Ams. United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 419 (8th Cir. 2007)).

Here, Ward claims that religious meals are provided for Christian holidays, such as the Fourth of July, Thanksgiving, and Christmas. Docket 1 at 20; Docket 1-1 at 16, 55. "Settled First Amendment jurisprudence holds that observances of such traditional holidays as Christmas and Thanksgiving do not rise to the level of violations of the Establishment clause." *Blagman v. White*,

112 F. Supp. 2d 534, 540–41 (E.D. Va. Sept. 14, 2000); *see also Flore v. Sioux Falls School Dist.*, 619 F.2d 1311, 1317 (8th Cir. 1980) (recognizing that some aspects of traditional holidays, particularly Christmas, has acquired significance that is secular and no longer confined to the religious sphere); *Shaw v. Wasko*, 4:22-CV-04054-KES, 2022 WL 3369297, at *9 (D.S.D. Aug. 16, 2022) (recognizing that "[t]he Eighth Circuit found that because the plaintiff sought accommodations for his own religious beliefs, he could not bring an Establishment Clause claim, as '[a] successful Establishment Clause claim would strike down any accommodation of religious beliefs in the prison's meal plans, which would effectively eviscerate the remedy [the plaintiff] seeks in his complaint.' " (quoting *Patel*, 515 F.3d at 816)). Ward sought accommodation of his own religious practices. *See generally* Dockets 1, 1-1. Ward's claims that religious meals are provided on Christian holidays does not allege sufficient facts to survive screening for violation of the establishment clause. Thus, Ward's establishment clause claim is dismissed without prejudice under 28 U.S.C. § 1915(e)(2)(B)(ii) and 1915A(b)(1).

### c.    Retaliation

To allege a First Amendment retaliation claim, a plaintiff must "show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876

(8th Cir. 2004)). "[T]he plaintiff must show the official took the adverse action because the plaintiff engaged in the protected [activity]." *Revels*, 382 F.3d at 876. "The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007) (citing *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994)).

### (i).    Claims Against Employees

Liberally construing Ward's complaint, he alleges claims for retaliation in violation of his First Amendment rights against Thom, Mueller, Yantis, Munsch, Wilson, Kathleen, Reichert, Madison, Welch, Espinoza, Dr. Jane/John Doe, Dr. Rachel, and Camren. Docket 1 at 26–27, 77–85. Although Ward does not specifically cite to the First Amendment for each defendant, this Court liberally construes Ward's complaint to allege First Amendment retaliation claims against these defendants because he has listed all of them under the heading "Retaliation." *Id.*

Here, Ward claims that he engaged in protected activity because he filed grievances and this lawsuit. Ward alleges that Yantis, Munsch, Wilson, Kathleen, Reichert, Madison, Welch, Espinoza, Dr. Jane/John Doe, Dr. Rachel, and Camren engaged in retaliatory conduct. Liberally construing Ward's complaint, he alleges that the retaliation occurred because of Thom and Mueller's failure to train or supervise their staff. *Id.* at 78–79. Thus, Ward's First Amendment retaliation claims against Thom, Mueller, Yantis, Munsch,

Wilson, Kathleen, Reichert, Madison, Welch, Espinoza, Dr. Jane/John Doe,[15]
Dr. Rachel, and Camren in their individual capacities for money damages
survive § 1915A screening.

### (ii).    Claims Against Pennington County

Ward sues Pennington County for retaliation. Docket 1 at 78. Ward's
complaint could be liberally construed to allege that Pennington County has a
policy to deny food to force inmates and detainees' compliance. *Id.* at 22. The
attachments to Ward's complaint could liberally be construed to allege that
PCJ administrators and command staff have a custom of sending staff to read
inmate's legal papers in retaliation for filing grievances. Docket 1-1 at 34, 41,
46–47. Thus, Ward has alleged sufficient facts for his First Amendment
retaliation claim against Pennington County in its individual and official
capacities for money damages to survive § 1915A screening.

### d.    Right to Send and Receive Mail

Ward sues Pennington County, Thom, Mueller, Yantis, Munsch,
Kathleen, Welch, and Madison for violation of his First Amendment right to
send and receive mail. Docket 1 at 35–39.

Inmates retain the First Amendment "right to send and receive mail."
*Thongvanh v. Thalacker*, 17 F.3d 256, 258 (8th Cir. 1994) (citations omitted).
"[A] prison inmate retains those First Amendment rights that are not
inconsistent with his status as a prisoner or with the legitimate penological

---

[15] Ward must identify unknown defendants. This Court bears no responsibility to
identify the individuals to whom Ward refers and intends to sue.

objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1997). "While prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights because of the needs of the penal system." *Kaden v. Slykhuis*, 651 F.3d 966, 968 (8th Cir. 2011) (citing *Turner v Safley*, 482 U.S. 78, 84–85 (1987)). In *Turner*, the Supreme Court held that prison rules and restrictions on First Amendment rights are constitutional only "if [they are] reasonably related to legitimate penological interests." 482 U.S. at 89. The Eighth Circuit has applied *Turner*'s four-factor test to prison regulations regarding mail:

> (1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.

*Thongvanh v. Thalacker*, 17 F.3d 256, 259 (8th Cir. 1994). This standard applies to both incoming and outgoing mail. *Id.*

### (i).    Claims Against Employees

Ward sues Thom, Mueller, Yantis, Munsch, Kathleen, Welch, and Madison for violating his First Amendment right to send and receive mail. Docket 1 at 36–39. He alleges that Yantis, Munsch, and Kathleen interfered with his mail and discovery requests sent to government agencies, hindered his

right to receive mail from his attorneys, and failed to supervise their staff. *Id.* at 37–39. Welch interfered with Ward's mail from his attorney and the Colorado Child Protection Ombudsman. *Id.* at 39. Madison interfered with Ward's mail and did not allow mail to or from his attorney. *Id.* Liberally construing Ward's complaint, he alleges that Thom and Mueller's failure to supervise their staff resulted in violation of his rights. *Id.* at 36–37. Thus, Ward's First Amendment right to send and receive mail claims against Thom, Mueller, Yantis, Munsch, Kathleen, Welch, and Madison in their individual capacities for money damages survive § 1915A screening.

### (ii).    Claims Against Pennington County

Ward claims that PCJ has a policy that restricted the sending and receipt of his mail. *See* Docket 1 at 34. He claims that the policy has impeded him sending mail to the ACLU, NAACP, and government officials. *See generally id.* Because Ward has alleged that PCJ's policy violates his First Amendment right to send and receive mail, this Court cannot determine at this time whether Ward's claim is wholly without merit. Thus, Ward's First Amendment right to send and receive mail claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening.

### e.    First Amendment Right to Communication

Ward sues Pennington County, Thom, Mueller, Yantis, Munsch, Kathleen, Welch, and Madison for violation of his First Amendment right to communication. Docket 1 at 36–39, 62–64, 66–68.

"It has been long held that inmates have the First Amendment rights to communicate with friends and relatives by means of visits, correspondence and telephone calls. Of course, the foregoing right is subject to rational limitations in the face of legitimate security interests of the penal institution." *Hutchings v. Corum*, 501 F. Supp. 1276, 1296 (W.D. Mo. 1980) (internal citations omitted). An inmate's "First Amendment right to communicate with the outside world is a fact-intensive universe." *Holloway v. Magness*, 666 F.3d 1076, 1079 (8th Cir. 2012). Courts apply the four *Turner* factors, which have been identified in the prior section, when analyzing whether a prison regulation violates an inmate's right to communication with the outside world. *Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir. 1989).

### (i).    Claims Against Employees

Ward claims that PCJ staff interfered with his right to call his family and his attorneys. Docket 1-1 at 182. When he was permitted to call his attorneys, the phone calls were recorded. Although Ward does mention that he received a visit from his attorney, it is unclear on the face of his complaint whether alternative means of communication were available with the outside world. Ward has alleged that these defendants were personally involved in his deprivation of rights or that the deprivation occurred because of the defendants' failure to train or supervise their staff; thus, Ward's First Amendment right to communication claims against Thom, Mueller, Yantis, Munsch, Kathleen, Welch, and Madison in their individual capacities for money damages survive § 1915A screening.

### (ii).   Claims Against Pennington County

For the purposes of screening, Ward's complaint could be liberally construed to allege that communication with the outside world through phone, mail, or other mediums was restricted based on widespread action and tacit authorization by policymaking officials. Docket 1 at 86, 90. Thus, Ward's First Amendment right to communication claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening by a thin margin.

### 2.   First and Fourteenth Amendments Access to the Courts

Ward sues Pennington County, Thom, Mueller, Yantis, Munsch, Kathleen, Welch, Madison, Reichert, and Camren for violation of his First and Fourteenth Amendment rights to access the courts. Docket 1 at 36–39, 62–68, 78–82, 89–92.

Although "the basis of the constitutional right of access to the courts" is "unsettled[,]" *Christopher v. Harbury*, 536 U.S. 403, 415 (2002), "[t]he Constitution guarantees prisoners a right to access the courts[,]" *White v. Kautzky*, 494 F.3d 677, 679 (8th Cir. 2007). "[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977).

To succeed on a claim for denial of access to the courts, a plaintiff must show that he suffered actual injury because of the defendants' actions. *Lewis v.*

*Casey*, 518 U.S. 343, 349 (1996). To satisfy the actual injury requirement, a plaintiff must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." *Johnson v. Missouri*, 142 F.3d 1087, 1089 (8th Cir. 1998) (quoting *Casey*, 518 U.S. at 353). "The right of access to the courts is satisfied if the prisoner has 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.' " *Zink v. Lombardi*, 783 F.3d 1089, 1108 (8th Cir. 2015) (quoting *Lewis*, 518 U.S. at 356); *see also Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) (holding that the right to access to the courts applies in habeas and civil rights contexts).

Many courts have held that an inmate's right of access to the courts is fully protected if the inmate is represented by counsel. *See Lemons v. Harvegrove*, 2012 U.S. Dist. LEXIS 51485, at *5–6 (E.D. Mo. Apr. 12, 2012) (collecting cases); *Washington v. Reliance Tel. Sys.*, 2019 WL 5580954, at *4 (D.N.D. Oct. 29, 2019) (collecting cases). Here, Ward claims that he was represented by counsel. However, he claims that his communication with counsel was interfered with because his legal mail to and from his attorneys were denied, he was unable to call his attorney for over a year, defendants read through his legal papers, and phone calls with attorneys were recorded when he was finally able to call his attorneys. Ward claims that Reichert removed pleadings that were negative against him. *See Foster v. Helling*, 210 F.3d 378, at *1 (8th Cir. 2000) (per curiam) (noting that First Amendment claims for reading and inventorying legal mail and participating in cell search that included search of box of legal materials against prison staff were sufficient to

survive § 1915A screening); *Goff v. Nix*, 113 F.3d 887 (8th Cir.1997) (prisoners had standing to bring claim that legal papers were taken without permission); *Waff v. S.D. Dep't of Corr.*, 51 F. App'x 615, 617 (8th Cir. 2002) (prisoner stated a claim by alleging that prison officials confiscated, lost, and destroyed his legal materials). Although the actual injury alleged is quite vague, Ward's complaint could be liberally construed to allege that defendants' actions hindered his ability to defend his criminal case and to prosecute this current case.

### (i).    Claims Against Employees

Because Ward alleges that his right to access the court was violated based on these defendants' actions or their failure to train or supervise their staff, Ward's First and Fourteenth Amendments access to the courts claims against Thom, Mueller, Yantis, Munsch, Kathleen, Welch, Madison, Reichert, and Camren in their individual capacities for money damages survive § 1915A screening.

### (ii).    Claims Against Pennington County

Ward alleges that Pennington County had a policy that allowed jail staff to go through and read his legal filings. Docket 1 at 15–16. He alleges that this policy violated his First Amendment right to access the courts because it interfered with protection of the attorney-client privilege. *Id.* at 16. Ward's complaint could also be liberally construed to allege that Pennington County had an unofficial custom based on widespread action of not allowing communication with attorneys, which was tacitly authorized by policy making officials. *Id.* Thus, Ward's First and Fourteenth Amendments access to the

courts claims against Pennington County in its individual and official capacities for money damages survive § 1915A screening.

### 3.    Fourth Amendment

Ward alleges claims under the Fourth Amendment against Reichert and Camren for unreasonable searches of his jail cell and legal papers and disposal of pages in his legal filings. Docket 1 at 65, 67–68, 81–82, 85. Although Ward does not specifically claim that Munsch and Kathleen violated the Fourth Amendment, he claims that searches were conducted at their direction. Docket 1-1 at 33–34, 164. Thus, this Court liberally construes Ward's complaint to allege Fourth Amendment claims against Munsch and Kathleen. The Fourth Amendment provides the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend IV.

The Eighth Circuit has indicated that "the extent of a pretrial detainee's fourth amendment rights while in jail is not settled." *United States v. Surridge*, 687 F.2d 250, 256 (8th Cir. 1982). Later in *United States v. Hogan*, the Eighth Circuit held that a pretrial detainee "had no legitimate expectation of privacy to the papers in his cell." 539 F.3d 916, 924 (8th Cir. 2008). The Eighth Circuit appears to have broadly interpreted *Hogan* to conclude that "detainees do not have a reasonable expectation of privacy in their jail cells[.]" *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013); *see also Hudson v. Palmer*, 468 U.S. 517, 529–30 (1984) (holding that inmates generally do not have a reasonable expectation of privacy in their cells); *Williams v. Campbell*, 25 F. App'x 477, 479

(8th Cir. 2001) (per curiam) (same). Further, "[c]ell searches for contraband can ordinarily be effected with physical mail inspection without reading the contents, and prison officials must maintain institutional security without being unnecessarily intrusive into inmate possessions." *Olson v. Klecker*, 642 F.2d 1115, 1118 (8th Cir. 1981) (per curiam).

Here, Ward claims that Reichert and Camren searched his cell as well as read and threw out Ward's legal documents that were inside his cell.[16] Docket 1 at 65, 67–68, 81–82, 85. Because courts generally have held that inmates and pretrial detainees do not have a reasonable expectation of privacy in their cells, and Ward has not identified any authority showing he has a reasonable expectation of privacy in his cell, Ward's Fourth Amendment claim for search of his cell is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Courts generally interpret claims for reading privileged legal mail and papers under the First Amendment rather than the Fourth Amendment. *See Foster*, 210 F.3d 378, at *1 (holding that allegation of prison official conduct relating to reading an inmate's legal mail is sufficient to state a First Amendment claim); *Thongvanh*, 17 F.3d at 258 ("Inmates clearly retain protections afforded by the First Amendment. This includes the right to send and receive mail." (internal citations omitted)); *Welsh v. Lamb Cnty.*, 2023 WL

---

[16] Ward also claims the Correctional Officers Bettelyoun, Stenton, and Stevenson searched his cell and read his legal papers, but Bettelyoun, Stenton, and Stevenson are not named as defendants. *See* Docket 1 at 2; Docket 1-1 at 27, 33–34, 40–41, 46–47.

3918995, at *2 (5th Cir. June 9, 2023) (affirming district court's dismissal of petitioner's Fourth Amendment claim alleging the confiscation of his legal papers). However, this Court cannot determine at this time that Ward's Fourth Amendment claims for reading his privileged legal papers and removing some of his legal papers are wholly without merit. Thus, Ward's Fourth Amendment claims against Reichert, Camren, Munsch, and Kathleen in their individual capacities for money damages for reading his privileged legal papers and disposing of pages in his legal filings survive § 1915A screening.

### 4.    Fifth Amendment

Ward alleges due process and equal protection claims arising under the Fifth Amendment. Docket 1 at 8, 69. Equal protection and due process claims against the federal government arise under the Fifth Amendment, and equal protection and due process claims against the states arise under the Fourteenth Amendment. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.' "); *Doe v. United States*, 901 F.3d 1015, 1027 (8th Cir. 2018) (stating that the equal protection clause is actionable against states under the Fourteenth Amendment and applies to the federal government through the due process clause of the Fifth Amendment).

The only federal defendant that Ward named was the USM, and all claims against the USM have been dismissed. *See supra* at 38–41. Thus,

Ward's Fifth Amendment due process and equal protection claims against the remaining defendants are dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). This Court will analyze Ward's due process and equal protection claims against the remaining defendants under the Fourteenth Amendment. *See infra* at 64–75.

### 5.    Sixth Amendment

#### a.    Access to the Courts

Ward alleges access to the courts claims under the Sixth Amendment against Pennington County, Thom, Mueller, Yantis, Munsch, Kathleen, Welch, Madison, Reichert, and Camren. Docket 1 at 35–39, 62–68, 78–82, 90–92. The Sixth Amendment provides that in all criminal prosecutions that accused shall have the right to "Assistance of Counsel for his defense." U.S. Const. amend. VI. "The right to counsel under the Sixth Amendment encompasses the right to have prison officials open and inspect privileged legal mail in the inmate's presence." *McCutcheon v. Lupinacci*, 2024 WL 667642, at *2 (W.D. Ark. Jan. 29, 2024) (citing *Wolff v. McDonnell*, 418 U.S. 539, 576–77 (1974), *R&R adopted by* 2024 WL 666482 (W.D. Ark. Feb. 16, 2024). When determining whether a defendant has violated an inmate's Sixth Amendment right to counsel, the United States District Court for the Western District of Arkansas looked at two factors: "first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant, or created a substantial threat of prejudice." *Scharnhorst v. Helder*,

2024 WL 3249738, at *18 (W.D. Ark. May 28, 2024) (quoting *United States v. Hari*, 67 F.4th 903, 912 (8th Cir. 2023)), *R&R adopted by* 2024 WL 3243475 (W.D. Ark. June 28, 2024). Evidence of actual prejudice may be necessary to show interference with the right to counsel. *Ervin v. Busby*, 992 F.2d 147, 150 (8th Cir. 1993) (citing *United States v. Lyons*, 898 F.2d 210, 216 n.6 (1st Cir. 1990)). In a 28 U.S.C. § 2241 case, this Court noted that "[i]f the jail's interference with [the inmate's] attorney-client relationship 'was neither accidental nor unavoidable, but was rather the result of deliberate and affirmative acts,' there was a violation of the Sixth Amendment if there was prejudice." *Duffy v. Brown Cnty.*, 1:11-CV-01038-CBK, 2012 WL 252641, at *12 (D.S.D. Jan. 25, 2012) (quoting *United States v. Danielson*, 325 F.3d 1054, 1059 (9th Cir. 2003)).

### (i).    Claims Against Employees

Ward alleges that his Sixth Amendment right to counsel was violated based on these defendants' actions or their failure to train or supervise their staff. Although it is somewhat unclear whether or to what extent Ward suffered any actual prejudice, Ward's Sixth Amendment right to counsel claims against Thom, Mueller, Yantis, Munsch, Kathleen, Welch, Madison, Reichert, and Camren in their individual capacities for money damages survive § 1915A screening by a thin margin.

### (ii).    Claims Against Pennington County

As identified under Ward's First and Fourteenth Amendments access to the courts claims, Ward's complaint could liberally be construed to allege a

policy or custom that inhibited his ability to communicate effectively with his attorney and an unofficial custom that permitted staff to read his privileged legal papers. *See supra* at 56–57. Although it is somewhat unclear on the face of the complaint whether or to what extend Ward suffered actual prejudice, Ward's Sixth Amendment access to the courts claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening by a thin margin.

### b.    Speedy Trial

Ward claims that his right to speedy trial was violated in both the state court and the federal court. Docket 1 at 65, 86, 88; Docket 8 at 10. He claims that PCJ staff were supposed to provide him documents and notice to allow him to waive his right to speedy trial or enforce extradition. Docket 1 at 86; Docket 8 at 10. He claims that this violated his right to speedy trial under the "Interstate Detainers Act." Docket 1 at 86. This Court assumes that Ward is referencing the Interstate Agreement on Detainers Act (IADA).

The Sixth Amendment guarantees that "the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. The right to a speedy trial is enforced against the States under the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 222 (1967) (quotation omitted). The United States Supreme Court has identified four factors to determine whether a defendant's Sixth Amendment Right to a speedy trial has been violated: (1) "length of delay," (2) "the reason for the delay," (3) "the defendant's assertion of

his right," and (4) "prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

### (i).    Claims Against Employees

Ward claims that because of Thom, Mueller, Yantis, Munsch, Kathleen, Reichert, and Madison his Sixth Amendment right to speedy trial was violated. Docket 1 at 65, 86–92. Thus, Ward's Sixth and Fourteenth Amendments speedy trial claims against Thom, Mueller, Yantis, Munsch, Kathleen, Reichert, and Madison in their individual capacities for money damages survive § 1915A screening by a thin margin.

### (ii).    Claims Against Pennington County

Ward has not claimed that the alleged violation of his speedy trial rights occurred as a result of a policy or custom of Pennington County. *See* Docket 1 at 65, 86, 88; Docket 8 at 10. Thus, Ward's Sixth and Fourteenth Amendments speedy trial claims against Pennington County for money damages are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### (iii).    Interstate Agreement on Detainers Act

"The basic purpose of the Interstate Agreement on Detainers is to ensure prompt disposition of outstanding charges in order to implement a prisoner's right to a speedy trial and to prevent interference with his participation in treatment and rehabilitation programs." *Rhodes v. Schoen*, 574 F.2d 968, 969 (8th Cir. 1978) (citing *United States ex rel. Esola v. Groomes*, 520 F.2d 830, 833-34 (3d Cir. 1975)). The IADA provides that

> [w]henever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction . . . his request for a final disposition to be made of the indictment, information, or complaint.

*United States v. Neal*, 564 F.3d 1351, 1353 (8th Cir. 2009) (quoting 18 U.S.C. app. 2, § 2, art. III(a)). However, IADA does not apply to pretrial detainees. *United States v. Harris*, 566 F.2d 610, 613 (8th Cir. 1977) (citations omitted).

At the time Ward filed his complaint, he was a pretrial detainee. Thus, Ward's claims under the IADA are dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 6. Eighth Amendment

Ward alleges claims arising under the Eighth Amendment. *See* Docket 1 at 23–27, 35–39, 50–56, 61–67, 77–81, 84–85, 89–92. At the time Ward filed his complaint, he was a pretrial detainee. Docket 2 at 1. "The Eighth Amendment does not apply to pretrial detainees, but the Due Process Clause of the Fourteenth Amendment imposes analogous duties on jailers to care for detainees." *Christian v. Wagner*, 623 F.3d 608, 613 (8th Cir. 2010) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Therefore, this Court will analyze Ward's Eighth Amendment claims under the Fourteenth Amendment. Thus, Ward's Eighth Amendment claims are dismissed without

prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 7.    Fourteenth Amendment

#### a.    Deliberate Indifference to Serious Medical Needs

Ward sues Pennington County, Mueller, Yantis, Munsch, Kathleen, Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, Megan, and Camren for deliberate indifference to his serious medical needs. Docket 1 at 50–56; Docket 1-1 at 114. A pretrial detainee's claims of inadequate medical care are analyzed under the Fourteenth Amendment's due process protections, rather than the Eighth Amendment. *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993) (per curiam). But because the Eighth Circuit Court of Appeals has not established a different standard for this analysis, these claims are examined under the same deliberate indifference standard as Eighth Amendment claims by convicted inmates. *Id.* at 152–53.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (footnotes omitted). "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a

violation of the Eighth Amendment." *Id.* at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Allegations of negligence will not suffice, nor will mere disagreement with treatment decisions. *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (citation omitted).

The deliberate indifference standard includes both an objective and subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Id.* (citing *Coleman*, 114 F.3d at 784). "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Coleman*, 114 F.3d at 784 (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). To be liable for deliberately disregarding medical needs, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

### (i).    Claims Against Employees

Here, Ward claims that Mueller, Yantis, Munsch, Kathleen, Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, Megan, and Camren were deliberately indifferent to his serious medical needs. Docket 1 at 50–56; Docket 1-1 at 114.

Because he has alleged personal involvement or awareness by each defendant, Ward's Fourteenth Amendment deliberate indifference to serious medical need claims against Mueller, Yantis, Munsch, Kathleen, Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, Megan, and Camren in their individual capacities for money damages survive § 1915A screening.

### (ii).    Claims Against Pennington County

Ward claims that Pennington County had a custom or unofficial policy to provide insufficient medical treatment and to consider unrelated factors when making medical decisions. Docket 1 at 54–55, 70–71, 83–85. Because this Court cannot determine that Ward's claims are wholly without merit at this stage, Ward's Fourteenth Amendment deliberate indifference to serious medical needs claims against Pennington County in its individual and official capacities for money damages survive § 1915A screening.

### b.    Conditions of Confinement

A pretrial detainee's conditions of confinement claims are analyzed under the Fourteenth Amendment's due process protections. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). "[T]he proper inquiry is whether those conditions amount to punishment of the detainee." *Id.* at 535. In *Bell*, the United States Supreme Court held that:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."

*Id.* at 538-39 (alteration in original) (internal citation and footnote omitted) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)). If a condition is "reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539 (footnote omitted). But if the condition is arbitrary or purposeless, the court can infer that the condition is a "punishment that may not constitutionally be inflicted upon detainees[.]" *Id.* "The Government has legitimate interests that stem from its need to manage the facility in which the individual is detained." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (citing *Bell*, 441 U.S. at 540).

### (i).    Claims Against Employees

Ward alleges that Espinoza, Thom, Mueller, Yantis, Munsch, Kathleen, Welch, Madison, Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, Megan, Reichert, Carmen, Wilson, and Moore violated his rights under the Fourteenth Amendment. Docket 1 at 27, 35–39, 50–56, 61–71, 77–85, 89–92. Ward's complaint could be liberally construed to allege that he was provided inadequate nutrition, inadequate access to medical care, frequent cell searches causing fear and intimidation, four total hours of recreation during a two-week period in segregation, among other conditions. Some of the conditions that Ward alleges taken individually may not amount to a violation of his rights. But when taken as a whole, Ward has alleged sufficient facts for his Fourteenth Amendment conditions of confinement claims against Espinoza, Thom, Mueller, Yantis, Munsch, Kathleen, Welch, Madison, Dr. Rachel, Dr.

Jane/John Doe, Nurse Jane Doe, Megan, Reichert, Carmen, Wilson, and Moore in their individual capacities for money damages to survive § 1915A screening.

### (ii). Claims Against Pennington County and TSG

Ward claims that Pennington County and TSG were deliberately indifferent to his conditions to the point that it became cruel and unusual punishment. Docket 1 at 24; *see also id.* at 50–51 (alleging Fourteenth Amendment claims against Pennington County).

Ward's complaint could be liberally construed to allege that Pennington County has a policy to deny food to force inmates and detainees' compliance. *Id.* at 22. Ward alleges in an affidavit attached to his complaint that the PCJ policies are unconstitutional because they do not provide notice of disciplinary actions and consequences. Docket 1-1 at 51–52. Thus, Ward's Fourteenth Amendment conditions of confinement claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening.

For the purposes of screening, Ward's complaint could be liberally construed to allege that TSG had an unofficial custom of providing meals with inadequate nutrition. Docket 1 at 24. He claims that TSG should have been aware and were deliberately indifferent to the violation because he filed complaints about the food and how approximately 900 calories of nutritional value per day was from butter. *Id.* at 14; Docket 1-1 at 26, 36–38. Thus, Ward's Fourteenth Amendment conditions of confinement claim against TSG in its

individual and official capacities for money damages survives § 1915A screening by a thin margin.

### c.    Procedural Due Process

Ward claims that he was sent to segregation without notice or a hearing in violation of his Fourteenth Amendment rights to procedural due process. Docket 1 at 59; Docket 1-1 at 129, 167. "A pretrial detainee cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less." *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002) (citing *Rapier v. Harris*, 172 F.3d 999, 1004–05 (7th Cir. 1999)). The Eighth Circuit has held that "placing a pretrial detainee in segregation prior to a hearing did not violate his Fourteenth Amendment right to procedural due process because the purpose of the segregation was 'for institutional security'—a legitimate governmental objective." *Hall v. Ramsay Cnty.*, 801 F.3d 912, 919 (8th Cir. 2015) (quoting *Whitfield v. Dicker*, 41 F. App'x 6, 7 (8th Cir. 2002) (per curiam)).

### (i).    Claims Against Employees

Ward claims that Camren, Reichert, Yantis, Munsch, and Kathleen placed him in administrative segregation without a hearing and or opportunity to be heard. Docket 1 at 59, 67–68. Liberally construing Ward's complaint, he alleges that the actions occurred because of Thom and Mueller's failure to train and supervise their staff. *Id.* at 62–63. Because this Court cannot determine at this time whether placing Ward in segregation was "for institutional security," Ward's Fourteenth Amendment procedural due process claims against Camren,

70

Reichert, Yantis, Munsch, Kathleen, Thom, and Mueller in their individual capacities for money damages survive § 1915A screening.

### (ii).    Claims Against Pennington County

Ward claims that PCJ has a policy about inmate infractions, but he claims that the policy does not give proper notice because the duration of punishment is not specified. Docket 1-1 at 52. Liberally construing Ward's complaint, he alleges that PCJ has a policy that does not provide proper notice for punishment, which he claims violates his rights. *Id.* Thus, Ward's procedural due process claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening.

### d.    Child Custody Proceedings

Ward also claims that defendants did not allow him to virtually attend hearings related to custody of his children. "[A]n inmate has no constitutional right to attend proceedings relating to a civil lawsuit." *Lager v. Attorney Gen.*, 1993 U.S. App. LEXIS 17487, at *2 (8th Cir. July 15, 1993) (per curiam) (citing *Fruit v. Norris*, 905 F.2d 1147, 1150 n.6 (8th Cir. 1990) and *Am. Inmate Paralegal Ass'n v. Cline*, 859 F.2d 59, 62 (8th Cir. 1988) (per curiam)). However, some courts have recognized that due process rights of a prisoner not permitted to attend custody hearings are not violated if the prisoner was represented by counsel and not denied the opportunity to present testimony or cross-examine witnesses. *Cook v. Boyd*, 881 F. Supp. 171, 175 (E.D. Pa. 1995) (collecting state court cases holding as such).

Here, Ward claims that he was not allowed to attend the virtual writs, and he has not clearly alleged that he was represented by counsel in the child custody proceedings. *See* Docket 1 at 87–88, 92; Docket 8 at 10. Ward claims that Yantis should have been aware of the child custody proceedings, and Munsch and Kathleen responded to Ward's grievances about not being permitted to attend the proceedings. Docket 1 at 87–88, 92; Docket 8 at 10. Liberally construed, Ward alleges that Thom and Mueller are liable for their failure to supervise. Docket 1 at 90–91. Thus, Ward's Fourteenth Amendment due process claims related to his child custody proceedings against Thom, Mueller, Yantis, Munsch, and Kathleen in their individual capacities for money damages survive § 1915A screening.

### e.    Grievances

Liberally construing Ward's complaint, he alleges a due process claim because defendants did not properly respond to or address his grievances. "While a violation of a state-created liberty interest can amount to a violation of the Constitution, not every violation of state law or state-mandated procedures is a violation of the Constitution." *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (per curiam) (holding that a refusal to process grievances alone did not state a constitutional deprivation). "[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates. Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the [F]ourteenth [A]mendment." *Id.* (first alteration in original) (quoting *Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill.

1982)); *see also King v. Houston*, 556 F. App'x 561, 563 (8th Cir. 2014) (per curiam) (explaining that, under *Buckley*, "prison officials' failure to process or investigate grievances, without more, is not actionable under § 1983"). Thus, Ward's Fourteenth Amendment due process claims that defendants did not properly address his grievances are dismissed without prejudice under 28 U.S.C. § 1915(e)(2)(B)(ii) and 1915A(b)(1).

### f.    Failure to Investigate

The Eighth Circuit has recognized a due process claim against "reckless or intentional failure to investigate that shocks the conscience[,]" but this right protects those being prosecuted for criminal offenses. *See Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009). A criminal defendant can bring such a claim in the following circumstances: "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, [or] (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Id.* Here, Ward alleges that defendants failed to properly investigate his grievances and complaints; the failure to investigate claim is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### g.    Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires the government to "treat similarly situated people alike," a protection that applies to prisoners. *Murphy*, 372 F.3d at 984 (quoting *Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir. 1999)). The Eighth Circuit Court of Appeals has explained that for

a prisoner to prevail on an equal protection claim, he "must show that he is treated differently from similarly-situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right." *Patel*, 515 F.3d at 815 (citations and internal quotation omitted). Race and religion are suspect classifications. *Id.* at 816 (citing *Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1016 (8th Cir. 2006)); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976). An equal protection claim based on religion requires that the inmate show that he was "denied a reasonable opportunity to pursue [his] faith as compared to inmates of other religions[.]" *Runningbird v. Weber*, 198 F. App'x 576, 578 (8th Cir. 2006).

### (i).    Claims Against Employees

Ward sues Thom, Mueller, Yantis, Munsch, Wilson, Kathleen, Reichert, Madison, Welch, Camren, Megan, Moore, Espinoza, Dr. Jane/John Doe, and Dr. Rachel for violating his right to equal protection. Docket 1 at 62–64, 66–71. Ward claims that he was treated differently based on his race and religion and because he exercised his fundamental rights. *See generally* Dockets 1, 1-1. Because Ward alleges personal conduct by these defendants, Ward's Fourteenth Amendment equal protection claims against Thom, Mueller, Yantis, Munsch, Wilson, Kathleen, Reichert, Madison, Welch, Camren, Megan, Moore, Espinoza, Dr. Jane/John Doe, and Dr. Rachel in their individual capacities for money damages survive § 1915A screening.

### (ii).   Claims Against Pennington County

Ward claims that administrative staff have a policy and custom that encouraged jail staff to violate his rights. Docket 1-1 at 57. He specifically claims that he was treated differently than Christian inmates under this policy because it denied him access to clergy, the ability to assemble, and religious meals. *Id.* Thus, Ward has alleged sufficient facts for his Fourteenth Amendment equal protection claim against Pennington County in its individual and official capacities for money damages to survive § 1915A screening.

### 8.   42 U.S.C. § 1986

Ward alleged a claim arising under 42 U.S.C. § 1986 in the grievances attached to his complaint. Docket 1-1 at 5. Claims under § 1986 "are dependent upon a valid § 1985 claim." *Jensen v. Henderson*, 315 F.3d 854, 863 (8th Cir. 2002).

Although Ward does not clearly cite to 42 U.S.C. § 1985, this Court liberally construes Ward's complaint to allege a claim under § 1985. Ward does not allege sufficient facts to raise a conspiracy claim under § 1985(1). The first phrase of § 1985(2) prohibits conspiracy "to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein[.]" The elements of a conspiracy under the second phrase of § 1985(2) are:

> 1) the defendants conspired; 2) for purposes of impeding, hindering, obstructing, or defeating in any manner the due course of justice; 3) with intent to deny a citizen of the equal protection of the law or injure [her] for lawfully enforcing, or attempting to enforce, the right of any person to the equal protection of the law.

*Main St. Props. LLC v. City of Bellevue*, 2021 WL 736711, at *5 (D. Neb. Feb. 25, 2021) (citing 42 U.S.C. § 1985(2)). To state a valid conspiracy claim under § 1985(3), the plaintiff must allege:

> (1) the existence of a civil conspiracy; (2) that the purpose of the conspiracy was to deprive her either directly or indirectly of her civil rights; (3) that a conspirator did an act in furtherance of the object of the conspiracy; and (4) damages, shown by demonstrating either injury to person or property or the deprivation of a civil right.

*Mettler v. Whitledge*, 165 F.3d 1197, 1206 (8th Cir. 1999). "In order to state a claim for conspiracy under § 1985, a plaintiff 'must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement.' " *Kelly v. City of Omaha*, 813 F.3d 1070, 1077–78 (8th Cir. 2016) (quoting *City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir. 1989)). Claims under § 1985(2) and (3) require that the conspiracy was fueled by class-based, invidiously discriminatory animus. *Andrews v. Fowler*, 98 F.3d 1069, 1079 (8th Cir. 1996) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993)); *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1429 (8th Cir. 1986).

In his complaint, Ward claims that Dr. Jane/John Doe and Dr. Rachel acted in conjunction with command staff to violate his constitutional rights. Docket 1 at 52, 54–55, 83–84. He claims that deprivations of his rights occurred and that defendants acted in conjunction to deprive him of his rights. *Id.* He alleges that the discrimination occurred based on religious and racial grounds. *See generally id.* Ward alleges that Yantis, Munsch, and Kathleen were command staff who were involved with his medical care. *Id.* at 84. Thus,

Ward's claims under 42 U.S.C. § 1985(2) and (3) against Dr. Jane/John Doe, Dr. Rachel, Yantis, Munsch, and Kathleen in their individual capacities for money damages survive § 1915A screening.

A claim under § 1986 requires that the plaintiff show: "(1) the defendants had actual knowledge of a § 1985 conspiracy, (2) the defendants had the power to prevent or aid in preventing the commission of the § 1985 conspiracy, (3) the defendants neglected or refused to prevent the conspiracy, and (4) a wrongful act was committed." *Keefe v. City of Minneapolis*, 785 F.3d 1216, 1223–24 (8th Cir. 2015) (citation omitted). "Firsthand knowledge is not required under § 1986. The courts have nevertheless required 'actual knowledge.' " *Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) (quoting *Clark v. Clabaugh*, 20 F.3d 1290, 1296 (3d Cir. 1994)). Although it is unclear whether Thom and Mueller had knowledge of defendants' actions before or after they occurred, Ward alleges that he wrote to Thom and Mueller to inform them about the actions of their staff. Ward claims that Thom and Mueller as sheriffs could have prevented defendants' actions. Thus, Ward's 42 U.S.C. § 1986 claim against Thom and Mueller in their individual capacities for money damages survive § 1915A screening by a thin margin.

### 9.    18 U.S.C. § 4013

Ward claims that 18 U.S.C. § 4013 permits non-federal institutions housing federal detainees "to make emergency protocols that require time frames which the jail has used on other inmates in USM custody with similar injuries." Docket 1 at 74; *see also id.* at 50; Docket 8 at 7. Ward appears to

77

allege that the jail and staff violated § 4013 because they did not enact an emergency protocol for his injuries. Docket 1 at 50, 74; Docket 8 at 7. Section 4013 "merely provides that the Attorney General is authorized to provide for the support of prisoners detained on federal charges in non-federal institutions, including, as relevant, medical care and health care." *Treadway v. Voutour*, 2012 WL 4959414, at *7 (W.D.N.Y. Sept. 27, 2012) (citing 18 U.S.C. § 4013 (a)(2) and (d)) *R&R adopted by* 2012 WL 4959411 (W.D.N.Y. Oct. 16, 2012). Several courts have recognized that § 4013 does not provide a private cause of action. *Casey v. Cent. Va. Reg'l Jail*, 2015 WL 8492768, at *5 n.3. (W.D. Va. Dec. 10, 2015); *Taylor v. Todd*, 2023 WL 8027819, at *4 (W.D. Ky. Nov. 20, 2023). And Ward has not cited any authority showing that § 4013 provides a private cause of action. Thus, Ward's claims under 18 U.S.C. § 4013 are dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 10. Religious Freedom Restoration Act (42 U.S.C. §§ 2000bb through 2000bb-4)

Ward alleges claims arising under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb through 2000bb-4. Docket 1 at 8. The Supreme Court has held that RFRA is "unconstitutional as applied to state and local governments because it exceeded Congress' power under § 5 of the Fourteenth Amendment." *Sossamon v. Texas*, 563 U.S. 277, 281 (2011). Thus, Ward fails to allege a claim under RFRA against Pennington County, jail employees, and jail contractors. *See Carter v. Wasko*, 4:22-CV-04103-RAL, 2023 WL 248233, at

78

*4 (D.S.D. Jan. 18, 2023) (dismissing RFRA claims against contractors with state penitentiary). Therefore, Ward's claims under RFRA against Pennington County, employees, and TSG are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).[17]

### 11. Religious Land Use and Institutionalized Persons Act (42 U.S.C. §§ 2000cc, 2000cc-5)

Ward alleges claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc and 2000cc-5. Docket 1 at 2. Liberally construing Ward's complaint, he alleges RLUIPA claims against Pennington County, TSG, Thom, Mueller, Yantis, Munsch, and Kathleen. Docket 1 at 23–27. RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (quoting 42 U.S.C. § 2000cc-5(7)(A)). "[A] prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation," and the prisoner must show that the prison policy substantially burdens the prisoner's exercise of religion. *Id.* at 360–61. RLUIPA applies when "(1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or (2) the substantial burden affects,

---

[17] Even though "RFRA's express remedies provision permits litigants, when appropriate, to obtain money damages against federal officials in their individual capacities[,]" *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020), Ward has not sued any federal officials in their individual capacities. Although this Court is unaware of any Eighth Circuit precedent, other circuits have held that RFRA does not waive the federal government's sovereign immunity for money damages. *See Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006); *Oklevueha Native Am. Church of Ha., Inc. v. Holder*, 676 F.3d 829, 840–41 (9th Cir. 2012); *Davila v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015). And Ward has not cited any authority to the contrary. Thus, Ward has not alleged that RFRA waived the United States' sovereign immunity.

or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. § 2000cc-1(b)(1–2).

To establish a prima facie case under RLUIPA, a plaintiff must show "that the government practice substantially burdens the person's exercise of religion[.]" *Van Wyhe v. Reisch*, 581 F.3d 639, 649 (8th Cir. 2009) (citing 42 U.S.C. § 2000cc-2(b)). If the plaintiff succeeds in making a prima facie showing, the defendant bears the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest. *Fowler v. Crawford*, 534 F.3d 931, 940–41 (8th Cir. 2008).

### (i).    Claims Against Employees

Ward claims that his religious exercise was substantially burdened by defendants denying him religious holiday meals, not providing a proper kosher diet, and not offering religious services or access to religious leaders. Docket 1 at 27. Ward claims that Thom, Mueller, Yantis, Munsch, and Kathleen were personally involved in violating RLUIPA or that their failure to train or supervise their staff caused the violation. *Id.* at 23–27. Because it is unclear from the face of the complaint whether defendants consented to conditions imposed by receipt of federal funding, this Court cannot determine that Ward's claims are wholly without merit. Thus, Ward's RLUIPA claims against Thom, Mueller, Yantis, Munsch, and Kathleen in their individual capacities for money damages survive § 1915A screening.

80

### (ii).    Claims Against Pennington County and TSG

Ward's complaint could be liberally construed to allege a RLUIPA claim

against Pennington County. Docket 1 at 24, 27. RLUIPA states that

> No government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution, as
> defined in section 1997 of this title, even if the burden results from
> a rule of general applicability, unless the government demonstrates
> that imposition of the burden on that person—
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. § 2000cc-1(a)(1–2). "Government" includes "a State, county,

municipality, or other governmental entity created under the authority of a

State[.]" 42 U.S.C. § 2000cc-5(4)(A)(i).

Here, Ward alleges that he practices his faith. Ward claims that PCJ

administrative staff had a policy and custom that denied Ward his right to

access clergy, to assemble with members of his religion, and to obtain meals

that complied with his religion. Docket 1-1 at 57. He also alleged that PCJ

received federal funding. *Id.* at 10. Thus, Ward has alleged sufficient facts for

his RLUIPA claim against Pennington County in its individual and official

capacities for money damages to survive § 1915A screening.

Liberally construing Ward's complaint, he also alleges a RLUIPA claim

against TSG. For the purposes of screening, Ward's complaint could be liberally

construed to allege that TSG had an unofficial custom of having kosher meals

be prepared by non-kosher food service workers and providing meals marked

as kosher that do not comply with kosher guidelines. Docket 1 at 24. He claims

that TSG should have been aware of and were deliberately indifferent to the

violation because he filed complaints about the food not being kosher, which Ward claims substantially burdened his religious exercise. *Id.* Although it is unclear based on Ward's complaint whether TSG received federal funding or whether TSG was merely paid by Pennington County as a contractor of the PCJ, he has alleged sufficient facts for his RLUIPA claim against TSG in its individual and official capacities for money damages to survive § 1915A screening.

### 12.    State-Law Claims

Ward alleges negligence and breach of contract claims. Negligence is not actionable under § 1983. *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005) (citation omitted). Ward has not alleged a federal cause of action under which a breach of contract claim arises. Thus, this Court construes Ward's negligence and breach of contract claims as arising under state law. A district court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Because these claims are part of the same case or controversy, this Court exercises supplemental jurisdiction over Ward's state-law claims.

### a.    Negligence

Ward alleges that the PCJ and staff acted with negligence when failing to provide sufficient information to his outside medical providers or when treating his knee pain. Docket 1-1 at 68, 105; Docket 8 at 6. Ward alleges that Mueller,

Yantis, Munsch, Kathleen, Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, Megan, and Camren were involved with his medical care. Docket 1 at 50–56; Docket 1-1 at 114.

Under South Dakota law, "[i]n order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury." *Hanson v. Big Stone Therapies, Inc.*, 916 N.W.2d 151, 158 (S.D. 2018) (quoting *Hamilton v. Sommers*, 855 N.W.2d 855, 861 (S.D. 2014)). "In a suit for professional negligence, the plaintiff must prove that the professional deviated from the required standard of care." *Id.* (citing *Magbuhat v. Kovarik,* 382 N.W.2d 43, 46 (S.D. 1986)). An employer may be vicariously liable for the negligent acts of their employees under respondeat superior. *Cameron v. Osler*, 930 N.W.2d 661, 666 (S.D. 2019).

Ward alleges that the entire situation of his knee treatment has been beyond negligent. Docket 1-1 at 105. Thus, Ward's state-law negligence claims against Mueller, Yantis, Munsch, Kathleen, Camren, and Pennington County and state-law medical malpractice claims against Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, and Megan survive § 1915A screening.

### b.    Breach of Contract

Ward asked if mail could be returned, placed in his personal property, or forwarded to his P.O. box. Docket 1 at 30. Munsch said if Ward provided the names of the agencies then that would not be a problem, which Ward claims was a verbal contract. *Id.* Ward claims that Munsch breached a verbal contract with him when Munsch did not return his mail, place it in his personal

property, or forward it to his P.O. box. *Id.* at 31; Docket 1-1 at 64. Ward alleges that defendants have breached the PCJ handbook, which he also claims is a contract. Docket 1-1 at 75. However, merely labeling a discussion or handbook as a contract without more does not state a cause of action for breach of contract.

Under South Dakota law, "[t]he elements of a breach of contract are (1) an enforceable promise; (2) a breach of the promise; and (3) resulting damages." *Bowes Constr., Inc. v. S.D. Dep't of Transp.*, 793 N.W.2d 36, 43 (S.D. 2010) (citation omitted). Under SDCL § 53-1-2, the "[e]ssential elements to existence of a contract are: (1) Parties capable of contracting; (2) Their consent; (3) A lawful object; and (4) Sufficient cause or consideration." "Good consideration for a contract may take the form of 'any benefit conferred or agreed to be conferred upon the promisor by any other person. . . .'" *Harms v. Northland Ford Dealers*, 602 N.W.2d 58, 63 (S.D. 1999) (quoting SDCL § 53-6-1) (alteration in original).

Ward does not clearly identify facts giving rise to a contract, nor has he alleged any alternative theory to seek equitable relief in the absence of a contract. Because Ward's breach of contract claim is too vague, his state-law breach of contract claim is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

## MOTION TO APPOINT COUNSEL

Ward moves to appoint counsel because he is a novice at law and the statutes under which he brings suit "are extremely complicated[.]" Docket 5 at

1. "A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). "In civil rights matters the court *may,* pursuant to 28 U.S.C. § 1915, request an attorney to represent a party if, within the court's discretion, the circumstances are such that would properly justify such a request." *Mosby v. Mabry,* 697 F.2d 213, 214 (8th Cir. 1982) (internal quotations and citation omitted).

In determining whether to appoint counsel to a pro se litigant's civil case, the district court considers the complexity of the case, the ability of the indigent litigant to investigate the facts, the existence of conflicting testimony, and the indigent's ability to present his claim. *Stevens*, 146 F.3d at 546 (citation omitted). Considering these factors, the Court does not deem it necessary to appoint counsel at this early stage in litigation.

The Court is aware that this situation may change as litigation progresses. As the Eighth Circuit Court of Appeals instructs, the Court will "continue to be alert to the possibility that, because of procedural complexities or other reasons, later developments in the case may show either that counsel should be appointed, or that strict procedural requirements should, in fairness, be relaxed to some degree." *Williams v. Carter*, 10 F.3d 563, 567 (8th Cir. 1993). Thus, Ward's motion to appoint counsel, Docket 5, is denied.

## MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY
## RESTRAINING ORDER

Ward requests a preliminary injunction and temporary restraining order under Federal Rule of Civil Procedure 65 and 18 U.S.C. § 3626. Docket 2. Ward requests that this Court order injunctive relief of release on bond. *Id.* at 3–4, 6, 23. He also requests that this Court award preliminary injunctive relief of transferring all federal inmates to a facility that will uphold their constitutional rights. *Id.* at 7, 11. In the alternative, if Ward is not released, he requests that he receive kosher meals, intense rehab services, chiropractic services, necessary imaging, and necessary surgery for his knee. *Id.* at 10. Additionally, he asks for injunctive relief requiring the PCJ to provide kosher meals, provide access to clergy, and require all staff to complete race-based training; requiring Pennington County and Rapid City to enforce policies against prison staff and to replace Yantis, Munsch, Kathleen, Dr. Jane/John Doe, and Dr. Rachel; and requiring TSG to enforce the contract of its duty. *See generally id.*

"A preliminary injunction is an extraordinary remedy[.]" *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011). When ruling on a motion for a preliminary injunction, the court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

But this Court need not analyze these factors because Ward is no longer detained at the PCJ. *See* Docket 15. An inmate's claims for injunctive relief are moot when he has been released or transferred from the institution and is no longer subject to those conditions. *Dulany*, 132 F.3d at 1239; *Martin*, 780 F.2d at 1337. Thus, Ward's motion for a preliminary injunction and a temporary restraining order, Docket 2, is denied as moot.

## CONCLUSION

Accordingly, it is ORDERED

1.    That Ward's motion to proceed in forma pauperis (Docket 3) is granted.

2.    That the Clerk of Court will send a copy of this order to the appropriate financial officer at Ward's institution.

3.    That the institution having custody of Ward is directed that whenever the amount in Ward's trust account, exclusive of funds available to him in his frozen account, exceeds $10.00, monthly payments that equal 20 percent of the funds credited the preceding month to Ward's trust account shall be forwarded to the U.S. District Court Clerk's Office under to 28 U.S.C. § 1915(b)(1), until the $350 filing fee is paid.

4.    That Ward's second motion for leave to proceed in forma pauperis (Docket 3-1) is denied as moot.

5.    That Ward's official capacity claims for injunctive relief are moot and are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

6.    That Ward's claims against the USM for money damages are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

7.    That Ward may file an amended complaint within **thirty days from the date of this screening order** naming the United States as the proper defendant under the FTCA and alleging sufficient facts to show that he has exhausted his FTCA claim before he filed this lawsuit.

8.    That Ward's claims against Rapid City are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

9.    That Ward's First Amendment free exercise claims against Thom, Mueller, Yantis, Munsch, and Kathleen in their individual capacities for money damages survive § 1915A screening.

10.   That Ward's First Amendment free exercise claims against Pennington County and TSG in their individual and official capacities for money damages survive § 1915A screening.

11.   That Ward's First Amendment retaliation claims against Thom, Mueller, Yantis, Munsch, Wilson, Kathleen, Reichert, Madison, Welch, Espinoza, Dr. Jane/John Doe, Dr. Rachel, and Camren in their individual capacities for money damages survive § 1915A screening.

12.   That Ward's First Amendment retaliation claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening.

13.   That Ward's First Amendment right to send and receive mail claims against Thom, Mueller, Yantis, Munsch, Kathleen, Welch, and Madison

in their individual capacities for money damages survive § 1915A screening.

14.   That Ward's First Amendment right to send and receive mail claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening.

15.   That Ward's First Amendment right to communication claims against Thom, Mueller, Yantis, Munsch, Kathleen, Welch, and Madison in their individual capacities for money damages survive § 1915A screening.

16.   That Ward's First Amendment right to communication claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening.

17.   That Ward's First and Fourteenth Amendments access to the courts claims against Thom, Mueller, Yantis, Munsch, Kathleen, Welch, Madison, Reichert, and Camren in their individual capacities for money damages survive § 1915A screening.

18.   That Ward's First and Fourteenth Amendments access to the courts claims against Pennington County in its individual and official capacities for money damages survive § 1915A screening.

19.   That Ward's Fourth Amendment claims against Reichert, Camren, Munsch, and Kathleen in their individual capacities for money damages for reading his privileged legal papers and disposing of pages in his legal filings survive § 1915A screening.

20. That Ward's Sixth Amendment right to counsel claims against Thom, Mueller, Yantis, Munsch, Kathleen, Welch, Madison, Reichert, and Camren in their individual capacities for money damages survive § 1915A screening.

21. That Ward's Sixth Amendment access to the courts claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening.

22. That Ward's Sixth and Fourteenth Amendments speedy trial claims against Thom, Mueller, Yantis, Munsch, Kathleen, Reichert, and Madison in their individual capacities for money damages survive § 1915A screening.

23. That Ward's Fourteenth Amendment deliberate indifference to serious medical need claims against Mueller, Yantis, Munsch, Kathleen, Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, Megan, and Camren in their individual capacities for money damages survive § 1915A screening.

24. That Ward's Fourteenth Amendment deliberate indifference to serious medical needs claims against Pennington County in its individual and official capacities for money damages survive § 1915A screening.

25. That Ward's Fourteenth Amendment conditions of confinement claims against Espinoza, Thom, Mueller, Yantis, Munsch, Kathleen, Welch, Madison, Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, Megan,

Reichert, Carmen, Wilson, and Moore in their individual capacities for money damages survive § 1915A screening.

26. That Ward's Fourteenth Amendment conditions of confinement claims against Pennington County and TSG in their individual and official capacities for money damages survive § 1915A screening.

27. That Ward's Fourteenth Amendment procedural due process claims against Camren, Reichert, Yantis, Munsch, Kathleen, Thom, and Mueller in their individual capacities for money damages survive § 1915A screening.

28. That Ward's procedural due process claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening.

29. That Ward's Fourteenth Amendment due process claims related to his child custody proceedings against Thom, Mueller, Yantis, Munsch, and Kathleen in their individual capacities for money damages survive § 1915A screening.

30. That Ward's Fourteenth Amendment equal protection claims against Thom, Mueller, Yantis, Munsch, Wilson, Kathleen, Reichert, Madison, Welch, Camren, Megan, Moore, Espinoza, Dr. Jane/John Doe, and Dr. Rachel in their individual capacities for money damages survive § 1915A screening.

31.  That Ward's Fourteenth Amendment equal protection claim against Pennington County in its individual and official capacities for money damages survives § 1915A screening.

32.  That Ward's claims under 42 U.S.C. § 1985(2) and (3) against Dr. Jane/John Doe, Dr. Rachel, Yantis, Munsch, and Kathleen in their individual capacities for money damages survive § 1915A screening.

33.  That Ward's 42 U.S.C. § 1986 claim against Thom and Mueller in their individual capacities for money damages survives § 1915A screening.

34.  That Ward's RLUIPA claims against Thom, Mueller, Yantis, Munsch, and Kathleen in their individual capacities for money damages survive § 1915A screening

35.  That Ward's RLUIPA claim against Pennington County and TSG in their individual and official capacities for money damages survives § 1915A screening.

36.  That Ward's state-law negligence claims against Mueller, Yantis, Munsch, Kathleen, Camren, and Pennington County and state-law medical malpractice claims against Dr. Rachel, Dr. Jane/John Doe, Nurse Jane Doe, and Megan survive § 1915A screening.

37.  That Ward's remaining claims are dismissed without prejudice under 28 U.S.C. § 1915(e)(2)(B)(ii) and 1915A(b)(1).

38.  That Ward's motion to appoint counsel, Docket 5, is denied.

39.  That Ward's motion for preliminary injunction and temporary restraining order, Docket 2, is denied as moot.

40.   That the Clerk of Court shall send blank summons forms and Marshall Service Forms (Form USM-285) to Ward so that he may cause the complaint to be served upon defendants Thom, Mueller, Yantis, Munsch, Dr. Rachel, Kathleen, Wilson, Reichert, Moore, Espinoza, Camren, Welch, Madison, Megan, Pennington County, and TSG.

41.   That Ward, after identification of Dr. Jane/John Doe and Nurse Jane Doe, shall inform the Clerk of Court of the unknown defendants' identities. At such time, the Clerk of Court shall send Ward blank summonses and Marshal Service Forms for the identified defendants.

42.   That Ward shall complete and send the Clerk of Court a separate summons and USM-285 form for defendants Thom, Mueller, Yantis, Munsch, Dr. Rachel, Kathleen, Wilson, Reichert, Moore, Espinoza, Camren, Welch, Madison, Megan, Pennington County, and TSG within **thirty days from the date of this Court's screening order**. Upon receipt of the completed summons and USM-285 forms, the Clerk of Court will issue the summons. If the completed summons and USM-285 form are not submitted as directed, the complaint may be dismissed.

43.   That the United States Marshals Service shall serve the completed summonses, together with a copy of the complaint and its exhibits, Dockets 1 and 1-1; the supplement, Docket 8; and this order upon the defendants.

44.    That defendants serve and file an answer or responsive pleading to the complaint on or before 21 days following the date of service or 60 days if the defendant falls under Fed. R. Civ. P. 12(a)(2) or (3).

45.    That Ward keep the Court informed of his current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by this Court's Civil Local Rules while this case is pending.

Dated March 28, 2025.

BY THE COURT:

/s/ *Camela C. Theeler*
CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE